188 P.2d 991

**HECKMAN et ux. v. HARRIS et ux.**

No. 4938.

Supreme Court of Arizona.

Jan. 26, 1948.

Laney & Laney, of Phoenix, for appellants.

Hill, Robert, Hill & Price, of Phoenix, for appellees.

BEAUCHAMP, Superior Judge.

This is an appeal from a judgment that the plaintiffs take nothing by their complaint to quiet title, and that the plaintiffs convey the premises to the defendants in accordance with the terms of certain escrow instructions. The facts are sub-

stantially as follows: On September 12, 1945, James J. Heckman and Ella Heckman, his wife, appellants and plaintiffs below, owned as community property a vacant lot on East McDowell Road in the City of Phoenix. On this day Ella Heckman, without the knowledge or consent of her husband, went with a duly authorized agent of the defendants, Ira E. Harris and Marjorie Ann Harris, his wife, appellees and defendants below, to a title company in Phoenix and there signed ordinary Escrow Instructions for the sale of this property to the defendants. The martial status of Mrs. Heckman and the community character of the property were known to the agent. Mrs. Heckman made it understood that the Escrow Instructions would have to be signed by her husband and the instructions so provided. In anticipation of Mr. Heckman's signing the Escrow Instructions the agent of defendants signed them and deposited with the title company the $3,000 agreed purchase price. When the Escrow Instructions were brought home for his signature, however, Mr. Heckman refused to sign them or to agree to the sale.

Several days after this trip to the title company Mrs. Heckman told the agent of the defendants that her husband had refused to sign; and, for the first time, told him that she and her husband had some five months before entered into another contract relating to the property that in her husband's opinion prevented the sale

to the defendants. This was a written contract with one Lillian O. Olsen, a widow who owned a drug store near this vacant lot. Mrs. Olsen agreed therein to loan money for the construction of a business building that the Heckmans agreed to erect on the property. The Heckmans, among other things also agreed to pay interest on the loan and to restrict the use of the building against its use as a drug store for a period of 10 years. Even though Mrs. Heckman had known for some time before signing the Escrow Instructions that the defendants were purchasing the property for the very purpose of building a drug store on it, this was the first time she disclosed the information regarding the Olsen Agreement to the defendants or their agent. Notwithstanding the knowledge of the existence and terms of this contract with Mrs. Olsen, however, the defendants were still anxious to complete the purchase. On September 21, 1945, after both sides had sought and obtained legal advice, the parties signed and acknowledged what may be called as Indemnity Agreement. This agreement was neither attached to the Escrow Instructions, nor did it make specific reference to them; but it contains the following provisions:

"Whereas, second parties desire to sell and first parties desire to purchase the said real estate, and the said parties have agreed upon the amount of such purchase price and the terms of such sale.

362

"Now, therefore, for the purpose of protecting and saving harmless the said second parties from any claims from said Lillian O. Olsen, arising out of the said contract and agreement, and in consideration of the sum of One Dollar ($1.00) paid first parties by second parties, first parties do hereby agree to indemnify and hold harmless second parties, their heirs, executors and administrators, from any and all claims which may now exist against second parties or may hereafter accrue under the terms of said agreement between second parties and the said Lillian O. Olsen."

Soon thereafter plaintiffs refused to go ahead with the sale and requested defendants to give them a quitclaim deed to remove the cloud on their title. This the defendants refused to do and plaintiffs filed in usual form a quiet-title action. In their answer the defendants contended that the plaintiffs had contracted to sell the property to them. Their cross-complaint prayed for specific performance. Plaintiffs in their answer to cross-complaint denied the making of any valid agreement of sale and asked that the title be quieted in them. The case was tried before the court and a decree was entered that the plaintiffs take nothing by their complaint and that the plaintiffs convey the premises in accordance with the terms of the Escrow Instructions. The plaintiffs' appeal is from the judgment and the order overruling the motion for a new trial.

The court made no findings of fact or conclusions of law and the plaintiffs have made seven assignments of error attacking the various theories upon which the court may have predicated the judgment. The defendants in their brief, however, contend that many of the issues thus created are inapplicable because: "* * * the theory, upon which the lower court based its decision, is that of an estoppel; estoppel of the plaintiffs to claim the benefits of the very legal propositions they argue in their brief."

Defendants, in relying on equitable estoppel and estoppel by contract, contend that the plaintiffs are estopped from denying that they made a contract to sell the property to defendants or claiming that the plaintiff wife was not acting as the agent of the community at the time she signed the Escrow Instructions. In City of Glendale v. Coquat, 46 Ariz. 478, 52 P.2d 1178, 1180, 102 A.L.R. 837, we said: "* * * Equitable estoppel may be defined as the effect of the voluntary conduct of a party, whereby he is absolutely precluded from asserting rights which might have otherwise existed as against another person who, in good faith, has relied upon such conduct and has been led thereby to change his position for the worse. The essential elements of estoppel are that plaintiff, with knowledge of the facts, must have asserted a particular right inconsistent with that asserted in the instant action, to the prejudice of another

who has relied upon his first conduct. Moore v. Meyers, 31 Ariz. 347, 253 P. 626. If any of these essential elements are lacking, there is no estoppel. * * *"

With this definition of equitable estoppel or estoppel in pais in mind, let us first look at the conduct of the parties before the signing of the Indemnity Agreement. If we were only concerned with Mrs. Heckman there might be merit to the defense of equitable estoppel. She kept silent about the contract with Mrs. Olsen at a time when she was conscience-bound to speak. She had known for some time that it was the intention of the defendants to erect a drug store on the property that would in the very nature of things be competition with the drug store of Mrs. Olsen. Nevertheless, she held her tongue and permitted the agent of defendants in ignorance of the existence of any such contract to sign the Escrow Instructions, deposit the $3,000 purchase price, and contract to pay the usual charges incident to an escrow. It must be borne in mind, however, that all these things had been done before Mr. Heckman knew anything about the transaction. Up to the time this knowledge was brought home to him, whatever was done by the defendants in the way of changing their position was done in no way in reliance upon anything said or done by him. This conduct of Mrs. Heckman does not constitute an estoppel as against Mr. Heckman or the community estate. In order for community property to be bound on the theory that the owners have been estopped from denying that they have agreed to sell it, both spouses would have to have indulged in the conduct giving rise to the estoppel, and even if one spouse was guilty of conduct sufficient to estop him or her, that would not estop the innocent spouse or the two of them in relation to their community property. Rundle v. Winters, 38 Ariz. 239, 298 P. 929.

Of what effect then was the signing of the Indemnity Agreement by Mr. Heckman as well as Mrs. Heckman in giving rise to the defense of estoppel by contract? Or the defense that the Indemnity Agreement constituted a ratification by the husband of his wife's authority to negotiate the sale of the property? Or, that aside from the validity of the defenses of estoppel and ratification, there was a completed sale upon the signing by them of the Indemnity Agreement as it can be seen from an examination of the Indemnity Agreement together with the Escrow Instructions that there was a sufficient memorandum to satisfy the statute of frauds? These matters need not be considered by us for the reason that they are all founded upon the Indemnity Agreement and presuppose its validity.

The rule as to illegality is stated in Am. Law Inst. Restatement, Contracts. Vol. 2 at p. 1081, as follows: "A bargain, the making or performance of which involves breach of a contract with a third person, is illegal."

364

The defendants knew all about the Olsen Agreement before there was anything that could be said to be a completed sale. The Indemnity Agreement was made in order to get Mr. Heckman to complete the sale. A copy of the Olsen Agreement was attached to the Indemnity Agreement at the time of its execution. There were covenants in the Olsen Agreement that couldn't be performed by any one but the Heckmans. It is true that there is some claim made by the defendants that they would have voluntarily complied with the covenant restricting the use of the premises or that they would have been required to do so by law. But whether or not these matters be true is immaterial and to no avail to defendants, because there were other covenants that patently couldn't be performed by the defendants. Mrs. Olsen had agreed to loan the Heckmans money, at interest, to build the building that the Heckmans had agreed to erect on the premises. This agreement was founded upon the trust and confidence that Mrs. Olsen had in the Heckmans, not the defendants. Mrs. Olsen was not before the court to have her rights in this contract adjudged. Can it be seriously said that the right provided for in the contract to loan her money at interest was not a material right? Certainly not. The sale of the property to the defendants would render the Heckmans unable to carry out this provision of their contract with Mrs. Olsen. In Hocking Valley Ry. Co. v. Barbour, 190 App.Div. 341, 179 N.Y.S. 810, 813, the court said: "It is not necessary here to hold that one purchasing goods known to have been contracted to another makes a contract tainted with illegality. Where, however, the contract, as in the case at bar, is to give a bond for the very purpose of inducing the vendor to violate his contract known to have been made, a different question is involved, and the contract comes within the condemnation of the law as one made directly for an illegal purpose, and therefore tainted with illegality. (Cases cited.)"

Defendants' reliance upon the Indemnity Agreement cannot be upheld. They realized that their attempted purchase of the premises under the Escrow Instructions alone could not be enforced because they were not signed by the husband and they did involve community property. Therefore, they seek to bind the husband and the community by setting up the Indemnity Agreement which was signed by him. They seek inequitably to enforce this Indemnity Agreement notwithstanding the fact that its manifest purpose was to further a breach by the Heckmans of their agreement with Mrs. Olsen.

For the reason stated, the case is reversed and remanded to the trial court with direction to quiet title to the property in plaintiffs.

La PRADE and UDALL, JJ., concur.

Note: STANFORD, C. J., being ill, the Honorable Edwin BEAUCHAMP, Judge of the Superior Court of Maricopa County, was called to sit in his stead.