313 P.2d 411

**CITY OF TUCSON, a municipal corpo-
ration, Appellant,**

v.

**Oliver J. KOERBER et al., Appellees.**

No. 6047.

Supreme Court of Arizona.

June 25, 1957.

Harold R. Neubauer, City Atty., Gerald B. Hirsch and A. Alan Hanshaw, Asst. City Attys., Tucson, for appellant.

McCarty & Chandler, Tucson, for appellees.

Conner & Jones, Tucson, amicus curiae.

STRUCKMEYER, Justice.

This is an action in damages for the negligent construction and maintenance of a culvert. It involves the same arroyo which has twice heretofore been before this court. City of Tucson v. O'Rielly Motor Co., 64 Ariz. 240, 168 P.2d 245; City of Tucson v. Apache Motors, 74 Ariz. 98, 245 P.2d 255, 260. Plaintiffs, appellees herein, after an extensive jury trial, recovered a judgment and the City of Tucson appeals.

Prior to 1925 there existed a natural arroyo running through the City of Tucson. Thereafter the city constructed a system of culverts which conducted underground the water flowing within the channel and covered over or filled in the arroyo. It is uncontradicted that the culverts were not of sufficient size to carry all of the water which from time to time drained off the watershed so that on occasions, in the years 1933, 1935, 1937, 1939, 1940, 1943, 1948 and 1953, they filled to capacity and the overflow spread out and ran down across the adjoining lands.

■ Since City of Tucson v. O'Rielly Motor Co., supra, it has been settled in this jurisdiction that if a municipal corporation constructs a culvert, it will be liable in damages for its inadequacy to carry away waters ordinarily coming into it, both the natural and normal flow and such abnormal and excessive flow as may reasonably be anticipated. In the following case of City of Tucson v. Apache Motors, we said that the city " * * * was required under the law to build culverts of sufficient size to adequately carry away all water accustomed to flow, or which may reasonably be anticipated to flow down such arroyo as a result of rains upon the watershed which it drained. * * *" The foregoing cases stated the principles of law relative to a determination of the issues then before the court, but in view of the issues presented in this controversy, we feel that it is necessary to enlarge somewhat on our previous views.

■ Ordinarily a municipal corporation has no duty to keep a stream flowing in a safe condition or to protect private property from overflow, but if it assumes to act, it is liable to the same extent as any other volunteer. It must act without negligence. Since the city has acted by covering over the arroyo and by providing culverts to carry underground the water which would be contained within the stream, its duty is to provide adequate culverts for that purpose, City of Tucson v. Apache Motors, supra. By diverting the waters underground through culverts, it has attempted

to contain whatever water is capable of being carried within the channel, both the natural and normal flow and such of the abnormal and excessive flow as might be reasonably anticipated at the time the culverts were installed, and is liable for damages proximately resulting from a failure to observe its duty in this regard.

█ Inherent in the view herein expressed are certain obvious limitations to the city's liability. We have heretofore defined flood waters as being those waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81. Since the city, by covering over the arroyo and providing culverts has only attempted to control the flow of waters within the arroyo, it has assumed no responsibility for water which naturally leaves the channel and, therefore, is not liable for the damages caused by flood waters. The city's immunity from liability for damages caused by flood waters is absolute unless some other act or acts of the city caused or contributed to the overflow.

██ Moreover, the city is not liable for damages caused by the failure to handle water within the channel discharged into the arroyo by third persons in such increased volume as could not be reasonably anticipated at the time of the construction of the culverts. A prima facie case is established by those showing damages by water overflowing from the arroyo caused by the inadequacy of the culverts. In order for the city to escape liability the burden is then on it to prove that the proximate cause of the overflow is the unanticipatable act or acts of third persons increasing the volume of water within the arroyo beyond the capacity of the culverts.

█ The city has questioned the refusal of the trial court to give a requested instruction which, in effect, told the jury that it was not liable for any damages occurring by reason of increased quantity of surface water draining into the arroyo because of artificial developments in areas outside the city and over which the city had no jurisdiction or control. We cannot examine into the claimed non-responsibility of the city under the peculiar circumstances of this case, since the city has failed to comply with Rule 51(a), Rules of Civil Procedure, 16 A.R.S., Section 21-1019 A.C.A.1939, requiring that exception be taken to the refusal to give requested instructions.

█ The city's first assignment of error relates to the failure of the trial court to direct a verdict in its favor because plaintiffs' damage was not proximately caused by the inadequacy of the culvert to carry away all the water capable of passing within the bed and banks of the arroyo. The evidence does not sustain the city's position on this point. A store building was erected

on Lots 9 and 10 of Block 44 in the City of Tucson. This building is eighty feet long and seventeen feet wide and fronts on Park Avenue to the west. The building is not within the channel of the arroyo, but its northeast corner abuts on the south bank. Plaintiffs were, on July 14, 1953, at the time of flooding complained of, tenants in this building. The arroyo itself drains generally from the east to the west and angles slightly in a northerly direction. At a point where the building touches the bank it is approximately ten feet deep, twenty to twenty-five feet wide at the bottom, with sloping banks at an angle of approximately forty-five degrees. The land immediately adjacent to the arroyo rises gradually from the banks both to the north and the south. The culvert starts on the east side of Park Avenue and runs westerly a distance of one-quarter of a mile. Across Park Avenue to the west, there has been constructed a service station. Seemingly the land there has been so filled that it is now at least one foot higher than the curb line of Park Avenue. The Murphey building is approximately level with the curb line and one foot above the top of the headwall of the culvert which, in turn, is approximately two feet above the top of the intake.

All the witnesses agree that on July 14, 1953, commencing at about the hour of 5:00 P.M. the following sequence of events occurred: That the culvert first filled with water to its capacity and then the water, unable to escape through the culvert, backed up, forming a pond, and finally escaped over the top of the headwall; that the water further ponded on Park Avenue until it reached a level at which it could ultimately escape to the west.

While many of the following facts are disputed, there is evidence from which the jury could have found facts favorable to plaintiffs, as follows: That the capacity of the culvert was 2,700 cubic feet per second; that the capacity of the arroyo at the intake of the culvert was 3,920 cubic feet per second; that the peak flow down the arroyo four blocks immediately to the east was 3,140 feet per second. From this the jury could have inferred not only that the arroyo was capable of draining and containing all the surface water which emptied into it prior to its entrance into the culvert, but that the culvert was incapable of carrying the water draining within the arroyo at the point of intake.

The city argues that the proximate cause of the plaintiffs' damages was not the inadequacy of the culverts, but the additional fact that the service station across Park Avenue, being higher than the headwall of the culvert, formed a barricade which caused the water to pond upon the plaintiffs' property. We cannot agree with this argument. The negligence of the city is constant from day to day and moment to moment from the time of the establish-

ment of the inadequate culverts, and its duty to provide adequate culverts is a continuing one to be exercised with due regard to the conditions affecting the flow of water to be accommodated. The efficient cause of the plaintiffs' damage is the city's original negligence. At most, the service station across the street forming a further barricade to the water was a concurring cause for which the city could not escape liability. Busy Bee Buffet v. Ferrell, 82 Ariz. 192, 310 P.2d 817.

■ The city further argues that it was not the water blocked by the inadequate culverts that damaged plaintiffs' property for two reasons. First, it is urged that the evidence shows that surface waters running down Park Avenue originally entered plaintiffs' building from the front. However, the evidence also establishes that this water normally would have passed into the arroyo through outlets provided in the street draining into the culverts. When the culverts filled to capacity, the surface water could not, therefore, escape into the culverts and it collected in the street until ultimately entering plaintiffs' building. It is the rule in this jurisdiction that one may not collect surface water and discharge it in unnatural quantities on the land of another. Roosevelt Irrigation District v. Beardsley Land & Investment Co., 36 Ariz. 65, 282 P. 937. The jury was fully justified in determining that the city's original negligence in providing inadequate

culverts caused this flooding of plaintiffs' premises.

■ Second, the city argues that the water which actually damaged plaintiffs was overflow which left the arroyo at a point about 1,200 feet upstream. There an abrupt curve existed which caused some of the stream waters to leave the channel and run down the adjacent "flood plane" in which plaintiffs' building was located. Undoubtedly it seemed to the jury that such water would have returned to the arroyo above the intake without entering plaintiffs' building if the stream had not already been filled and overflowing due to the pooling caused by the inadequacy of the culvert. The evidence is unquestioned that water did not enter from the rear of the building until the pooled water rose to the level of the floor.

■ The city assigns as error the trial court's permitting, over objection, the cross-examination of the city engineer of Tucson for the reason that he was not a party to the action and was not an "* * * officer, director, or managing agent * * *" within the meaning of Section 21–922, A.C.A.1939, Rules of Civil Procedure, Rule 43(g), 16 A.R.S. The city engineer is an appointive officer under the mayor and council, Charter of the City of Tucson, Chapter V, Sections 1 and 2. While the charter itself designates the city engineer as an "officer," we do not think this is nec-

essarily the only test to be applied here. The city engineer is subject to the general supervision and direction of the city manager, but he is also specifically granted broad general powers. His duties are prescribed by Chapter X, Section 5, of the charter. Among other things, he " * * shall perform all the engineering and surveying required in the carrying on of public works and improvements done under the authority of the mayor and council. * * . * " His judgment and discretion at least in some respects is decisive.

Section 21–922 is derived from and is identical in language to a part of Federal Rules of Civil Procedure, Rule 43(b), 28 U.S.C.A., which in turn is similar in language to Federal Rule of Civil Procedure 26(d) (2). The term "managing agent" has been construed to be: (1) a person invested with general powers to exercise his judgment and discretion in dealing with corporate matters; (2) a person who could be depended upon to carry out his employer's direction to give testimony at the demand of a party engaged in litigation with the employer; and (3) a person who can be expected to identify himself with the interests of the corporation rather than with those of the other parties. Rubin v. General Tire & Rubber Co., D.C., 18 F.R.D. 51; Warren v. United States, D.C., 17 F.R.D. 389; Krauss v. Erie R. Co., D.C., 16 F.R.D. 126. The city engineer of Tucson is a managing agent subject to interrogation by leading questions as an adverse party within the meaning of the foregoing decisions.

The city assigns as error the failure of the trial court to give its requested instructions on contributory negligence and assumption of risk. There is some doubt from the record whether defendant's requested instructions on these subjects are properly assigned as error, but since the issues raised are so fundamental, we will briefly refer to the correct rule. A landowner or occupier of premises may make full and lawful use of his land. He is not required to take precautions against damage which can only occur as a result of another's negligence. LeRoy Fibre Co. v. Chicago, M., & St. P. R. Co., 232 U.S. 340, 34 S.Ct. 415, 58 L.Ed. 631; Kleinclaus v. Marin Realty Co., 94 Cal.App.2d 733, 211 P.2d 582. Accordingly, as a matter of law, the plaintiffs were not contributorily negligent or assumed the risk of injury when occupying premises which could be damaged only by reason of the city's negligence.

The city further assigns as error the giving of plaintiffs' requested instructions "7" and "8". The consideration of this assignment necessitates an examination into additional facts established at the trial in this cause. It appears that for some time prior to the flooding of which the plaintiffs complain, one John W. Murphey had been the owner of Lot 10 in Block 44, Tucson.

In 1953 he purchased Lot 9 of the same block, being the adjoining lot, from the city and paid $4,000 for it. At the time Murphey purchased Lot 9, it was the practice of the city to sell city property subject to a flowage easement for water and the deed to Lot 9 so provided in this language:

"Reserving, however, unto the party of the first part, its successors and assigns full right of flowage for water on and across said lands, resulting from the overflowing, from whatever cause, of any drain, ditch or arroyo, as now constituted or hereafter modified, or from any other cause."

Prior to the purchase of Lot 9, at a meeting with the then mayor at which several council members were also present, Murphey informed the mayor of his desire to purchase Lot 9 and of his further intention to build a building on it. Although Murphey had attempted to purchase Lot 9 previous to that time, he had been unable to come to any agreement with the city. At the meeting he was advised by the mayor, who was also chairman of the Building and Land Committee, that the Building and Land Committee would agree to recommend the sale to the city council providing Murphey made a written proposal agreeing to erect a building on the property costing not less than $20,000. Such a letter was written addressed to the mayor and council. It reads:

"I wish to purchase Lot 9 in Block 44 of University Heights Addition to the City of Tucson and am willing to offer you the appraised value of the same in the amount of $4,000.00 cash, subject to the usual City flood liability clause.

"I have plans to build a building costing approximately $20,000 immediately, which will increase the City's income from taxes on a property which is now non-productive as far as the City is concerned."

This offer to purchase was accepted and shortly thereafter a building permit was issued by the city to construct the contemplated building. The building was placed in part on Lot 9 and in part on Lot 10 of Block 44.

It is the plaintiffs' theory that the city either abandoned, waived, or was estopped to assert the easement under the foregoing facts and their requested instructions "7" and "8" left to the jury for its determination this question. It is the city's position, as incorporated in its two proposed instructions "H" and "X", that as a matter of law these facts were not sufficient to deprive it of its right to assert the easement. The trial court adopted the plaintiffs' theory, giving their requested instructions and

refusing the city's instructions. We think this was error.

This court has often defined abandonment, waiver and estoppel. Abandonment involves an intention to abandon, together with an act or an omission to act by which such intention is apparently carried into effect, Gila Water Co. v. Green, 27 Ariz. 318, 232 P. 1016, on rehearing, 29 Ariz. 304, 241 P. 307. Waiver is the voluntary and intentional relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such right. Marsin v. Udall, 78 Ariz. 309, 279 P.2d 721; In re Brandt's Estate, 67 Ariz. 42, 190 P.2d 497; Yuma County v. Arizona Edison Co., 65 Ariz. 332, 180 P.2d 868. It is to be observed that both abandonment and waiver require the concurrence of act and intent, although the intent may be manifested or inferred from the act. The difference between abandonment and waiver is consensual.

Plaintiffs here rely on two acts which assertedly evidenced the intent; first, the sale of Lot 9 by the city with the knowledge that a building was to be placed on it; and second, the issuance of a permit for the erection of the building. These acts do not warrant the inference that the city intended to waive or abandon its easement. When Murphey proposed to purchase Lot 9, "subject to the usual City flood liability clause," it is too plain for argument that he did not then expect the city to abandon or waive the easement. When the city issued a deed with the specific reservation of the "full right of flowage for water on and across said land," which was in accord with Murphey's written proposal and accepted by him, the only possible conclusion is that notwithstanding Murphey's plan to erect a building, the city intended to preserve a right to flow water across Lot 9. Had the city intended otherwise, the deed would have been issued without the reservation. Parol evidence would not, of course, be admissible to vary the literal language of the instrument. Diamond v. Chiate, 81 Ariz. 86, 300 P.2d 583. Moreover, we are unable to conclude that the mere issuance of a building permit is susceptible of any greater inference than that the city, being protected by its flowage easement was not concerned with the risks that Murphey chose to assume in utilizing this property.

Estoppel arises where one with knowledge of the facts has acted in a particular manner so that he ought not to be allowed to assert a position inconsistent with his former acts to the prejudice of others who have relied thereon. Unruh v. Industrial Commission, 81 Ariz. 118, 301 P.2d 1029; Weaver v. Martori, 69 Ariz. 45, 208 P.2d 652; Heckman v. Harris, 66 Ariz. 360, 188 P.2d 991; Butler v. Quinn, 40 Ariz. 446, 14 P.2d 250. Essentially the doctrine of estoppel requires of a party consistency of conduct when inconsistency would work

substantial injury to another. The issuance of the deed with the reservation of the right of flowage could not, of course, work an estoppel, because this is what the parties bargained for. That Murphey may have made a bad bargain when he purchased Lot 9 does not change the fact that he paid $4,000 for a lot with a specific reservation on it. That the city may have inferentially approved of the placing of Murphey's building on Lot 9, perhaps even to the extent of using that fact as part of the consideration for the sale, does not mean that the city adopted a position inconsistent with the exercise of its flowage easement. The flowage easement was reserved to the city in spite of the fact that Murphey was to erect a building on the lot, and even if it be assumed from the mere issuance of a building permit that the city further approved of the construction, such would not be inconsistent with the assertion of its right to flow water across the property because the purpose of the easement is to hold the city harmless from damages caused by the exercise of the right reserved. Plaintiffs, as tenants of Murphey, are charged with constructive notice of the contents of his deed. Mountain States Telephone & Telegraph Co. v. Kelton, 79 Ariz. 126, 285 P.2d 168.

One further technical point urged by the plaintiffs should be examined. Plaintiffs point out that the city's assignment of error Number 10 questioning the trial court's action in submitting as an issue of fact to the jury the abandonment, waiver, and estoppel to assert the flowage easement does not comply with the rules of this court. As stated the trial court adopted the plaintiffs' theory of the case, advising counsel that plaintiffs' "7" and "8" would be given and defendant's "H" and "X" would be refused. Counsel for the city objected to this action of the court but for some reason categorically limited the objection to the failure to give defendant's "X". The city assigns as error the giving of plaintiffs' "7" and "8". Civil Rule 51(a), 16 A.R.S., supra, provides that no party may assign as error the giving of an instruction unless he objects thereto before the jury retires. We have often held in following this rule that instructions not specifically objected to at a trial cannot be assigned as error. See: Musgrave v. Githens, 80 Ariz. 188, 294 P.2d 674. Its purpose is to require counsel to fully inform the trial court of the basis for a litigant's position so that the court may not be led into involuntary error. Here the objection to the failure to give defendant's "X" clearly apprised the trial court of the city's theory. Moreover, counsel for the city had repeatedly objected to the introduction of the evidence assertedly raising abandonment, waiver and estoppel, each time advising the court as to the reasons therefor. Since the objection to defendant's "X" clearly apprised the trial court of the city's theory

and since the basis for an objection to plaintiffs' "7" and "8" is the same, we deem that it is sufficiently broad to include an assignment of error for the giving of plaintiffs' "7" and "8".

It follows from what has been said that defendant City of Tucson, having neither abandoned, waived, nor being estopped to flow water across Lot 9, is not responsible in damages for the destruction of plaintiffs' property which occurred in that portion of the building on Lot 9. The verdict of the jury and judgment being for all of the damages which occurred by reason of the flooding of July 14, 1953, must be reversed, and it is so ordered with instructions that on a re-trial the sole issue to be submitted to the jury is to determine the extent of plaintiffs' damages occurring by reason of the flooding of Lot 10.

WINDES, PHELPS and LA PRADE, JJ., concur.

UDALL, C. J., having disqualified himself, the Honorable GORDON FARLEY, Judge of the Superior Court of Santa Cruz County, participated in his stead in the determination of this appeal.

FARLEY, Superior Court Judge (specially concurring).

While the end result reached by the majority in reversing the trial court is in accord with my views, our reasons for arriving at the same conclusion are only partly in harmony. It is my belief that the resultant discord is of such transcendency that I am compelled, with all due deference to the majority, to separately state the rationale for reaching that conclusion.

The majority has indicated that it is unable to examine the claimed non-responsibility of the city for increased surface water draining into the arroyo because of artificial developments in areas outside the city and over which it had no jurisdiction or control, for the reason that the city failed to comply with Rule 51(a) requiring that exception be taken to the refusal to give requested instructions. The objection that Rule 51(a) had not been complied with was first raised by the Appellees in their "Memorandum of Additional Authorities" which was handed to the court at the time of oral argument, more than a month after appellants' Reply Brief had been filed.

No formal request for leave to file additional points as distinguished from additional authorities was requested or granted by the court as provided in Subdivision 3 of Rule 5(f) of the Rules of this court. 17 A.R.S. That objection should properly have been made a part of Appellees' Reply Brief, as it presents a proposition of law that would normally be raised in the briefs.

The subject which the majority declines to consider had been extensively briefed by both sides and leave of court had been

granted amicus curiae to argue the issues raised by the briefs before the objection was raised. It is my view that if technical rules are to be applied this court should take the position that no leave has been granted to present at such a late date the objection that Rule 51(a) has not been complied with. Particularly, since the questions raised in the briefs are of such importance to the rapidly expanding municipalities of Arizona, technical disposition of such issues should be avoided. For an interesting illustration of how this court has heretofore deviated from the stringent requirements of Rule 51 (a) see the case of Tipton v. Burson, 73 Ariz. 144, 238 P.2d 1098.

The evidence is undisputed that the development outside the city, and over which it had no control, principally in the area of Davis-Monthan Field, resulted in an increased flow of approximately 900 cubic feet per second in the Tucson Arroyo. Most of that development occurred subsequent to World War II and long after the completion of the culvert in 1931. It goes without saying that no engineer who undertook to design a culvert on the Tucson Arroyo in 1925, in the exercise of ordinary care, could have reasonably anticipated the establishment of and the extraordinary developments at Davis-Monthan Field. If a city undertakes and does all that it is able, in the judgment of its governing body, to correct a condition sought to be eliminated, it should not face potential liability from that time on into the distant future for flood damages caused by increased flow occurring from changed conditions entirely outside of its borders and beyond a reasonable foreseeability. To invoke such a rule would bring about a stalemate in any improvement on the part of municipalities in flood control.

It has been suggested by counsel for the City and by amicus curiae, in effect, that this court re-examine its holdings in City of Tucson v. Apache Motors, 74 Ariz. 98, 245 P.2d 255, and City of Tucson v. O'Rielly Motor Co., 64 Ariz. 240, 168 P.2d 245, because the rule announced in the O'Rielly case was based on an incomplete presentation of the facts, which re-examination the majority has done up to a point. The O'Rielly case was relied on by this court for its statement in the Apache Motors case that

"This constitutes a judicial finding of fact that the culverts in question were negligently constructed in that they were too small to carry away the flood waters which naturally flowed down the arroyo as the result of occasional rainfalls upon the watershed drained by said arroyo. It is therefore res judicata as to that fact." [74 Ariz. 98, 245 P.2d 260.]

The use of the term "res judicata" was technically incorrect inasmuch as no privity of parties existed between the litigants in the O'Rielly case and the City of Tucson v. Apache Motors, except insofar as the facts therein announced were adopted in the Per Curiam memorandum opinion in the first City of Tucson v. Apache Motors case reported in 64 Ariz. 251, 168 P.2d 253. Since we are not confronted with any privity of parties in this appeal the doctrine of res judicata is of course inapplicable. 30 Am. Jur. 908, et seq.

The O'Rielly case presented a situation wherein the City offered no evidence in its defense as to the carrying capacity of the culvert. In the instant case the City had numerous witnesses, both expert and lay, who testified that the natural arroyo overran its banks during flood season on a number of occasions prior to the installation of the culvert. Furthermore it appeared in the O'Rielly case that a great accumulation of debris was in the tunnel in addition to pipes and sewer mains. In the instant case no evidence of an accumulation of debris appeared, but on the contrary the testimony was that the City kept the channel relatively free of brush or debris, and had eliminated most of the pipes and mains in the culvert.

The majority has taken as true the testimony of one of the engineers who stated that in his opinion the capacity of the culvert was 2700 cubic feet per second. An examination of the witness' testimony reveals that that estimate was based upon a double 8' x 10' culvert, while the uncontroverted facts showed that the mouth of the culvert was a double 10' x 10' for a distance of over 40 feet, where it reduced to a double 8' x 10'. The only engineer who took into account the true dimensions of the culvert estimated its carrying capacity at 3,490 cubic feet per second. The estimated carrying capacity of the arroyo at the time of the flood in question varied from the maximum of 3,920 cfs in the swirl area at the intake of the culvert to 3,300 cfs at 101 feet east of the culvert, to 3,670 cfs at 213 feet east of the culvert, to 1,575 cfs 766 feet east of the culvert, to a mere 1,250 cfs 1,190 feet east of the culvert.

From the foregoing estimates it would appear that there was sufficient evidence to entitle the City to the instructions, which it requested and the trial court refused, to the effect that a city which installs a culvert or other structure in an arroyo or natural stream is not required to provide a capacity of such structure in excess of the natural volume capacity of the arroyo or stream. In other words, if the floodwaters would have overflowed the banks of the arroyo for a reasonable distance of the defined channel, whether the city structure were there or not, there should not be any liability imposed upon the City. If the

stream or the arroyo would have overflowed had the city done nothing, how then can it be said that the city's installation of the culvert was the cause of plaintiff's injuries?

In applying the rule quoted by the majority from the case of City of Tucson v. Apache Motors to the effect that the city was required to build culverts of sufficient size to adequately carry away all water accustomed to flow or which may be reasonably anticipated to flow down such an arroyo as a result of the rains upon the watershed which it drained, it seems reasonable to define such flow as that which could normally be carried within the confines of the arroyo for a reasonable distance, and any flow which the city could establish exceeded the volume capacity of the arroyo for a reasonable distance should be characterized as such flow which could not reasonably be anticipated.

In addition to the foregoing observations it is my view that the flowage easement constituted a defense available to the City which, as indicated by the majority, had not been abandoned or waived. Whether on a retrial a trial court as a practical matter can segregate the damages as suggested by the majority is a matter of grave doubt.