H. Greenway ALBERT and Maja Greenway Albert, Appellants,

v.

Ira B. JORALEMON, Appellee.

No. 16222.

United States Court of Appeals Ninth Circuit.

Oct. 19, 1959.

Gatewood & Greenway, Charles C. Gatewood, McCarty, Chandler & Udall, James L. Richmond, Tucson, Ariz., for appellants.

Boyle, Bilby, Thompson & Shoenhair, Wilbert E. Dolph, Tucson, Ariz., for appellee.

Before STEPHENS, BAZELON and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

On or about September 21, 1956, H. Greenway Albert and Maja Greenway Albert, husband and wife, appellants and lessors, leased to Ira B. Joralemon, appellee and lessee, certain mining claims in Arizona. The lease required the lessee to make monthly payments of $1,000 and to make additional quarterly payments of $7,000, beginning with the quarterly payment due November 8, 1956. The lease also contained clauses giving the lessee the right to terminate under certain conditions.

A dispute arose between the lessor, Albert, and the lessee as to whether the lessee had in fact terminated the lease in the manner provided therefor in the lease, and the lessee brought an action in the United States District Court for the District of Arizona for a declaration of the parties' rights under the lease. Appellants are citizens of Arizona and the appellee is a citizen of California. Jurisdiction of the District Court is derived from diversity of citizenship, 28 U.S.C.A. § 1332.

The lease, which was not recorded, contained two paragraphs which referred to the right of termination. They were as follows:

"3. * * * the lessee may at any time after payment of the first quarterly payment of Seven Thousand Dollars as hereinafter set forth, surrender this lease by giving notice in writing thereof to the lessors, accompanied by an executed and acknowledged quitclaim deed extinguishing all rights of the lessee hereunder and relinquishing to the lessors the demised properties. Upon delivery of such notice and deed and the relinquishment of all the demised properties, all rights and obligations of the parties hereto not then accrued shall cease and terminate. * * *

"13. * * * It shall be further agreed that said lease may be terminated at any time by the Lessee as to all or any portion thereof by giving the Lessors written notice of such intention, and that upon termination or surrender the Lessee will, upon the request of the Lessors, execute and record in the appropriate public office a formal release and discharge evidencing such termination, provided that payments hereunder shall continue as provided hereunder until the lease shall have been terminated as to all of the demised properties."

It appears that under paragraph 3, the lease may be terminated by (1) notice in writing of the surrender of the lease, (2) payment of the first quarterly rental payment, (3) delivery of a quitclaim deed, and (4) relinquishment of the premises; while under paragraph 13, only a notice of intention to terminate is required with the additional requirement that lessee will "upon the request of Lessors" execute and record "a formal release and discharge evidencing such termination. * * * "

There appears to be little dispute in the evidence as to what transpired. The parties to the lease had known each other for almost 50 years. On November 5, 1956, the lessee wrote a letter to the lessor, the pertinent portions of which were as follows:

"As we have found no ore in five drillholes, on your Cornelia group of claims, I am reluctantly forced to surrender the lease and option to me on the 39 claims in the Ajo mining district that was signed by you and Mrs. Albert on September 21, 1956. The $7,000 payment due on November 8, 1956, will be paid when due, and the quitclaim deed specified in Paragraph 3 of the contract will be sent to you as soon as practicable.

"While we found a little lean disseminated copper bearing porphyry in one hole, our drilling proved that in most of the area either deep conglomerate or barren pre-Cambrian micaceous quartzite underlie 100 to

200 feet of alluvium. There is not room for a valuable ore body between these two barren formations.

"I am sorry we did not have better luck in the exploration."

Immediately thereafter the lessee moved off the property as the lessor knew he intended to do.

On or about November 6, 1956, the lessee through his agent mailed to the lessor a check for $1,000, representing the regular monthly rental payment, and a check for $3,932.15, representing the first quarterly rental payment of $7,000 less amounts claimed by plaintiff to be deductible under the agreement as legal expense incident to clearing title to the demised premises.[1]

On or about November 16, 1956, lessor phoned lessee requesting copies of the logs of the five drill holes drilled by lessee. These were promptly sent by lessee. In the same conversation, lessor stated that he believed he had been underpaid on the quarterly rental, and was told by lessee "that was a legal matter to decide how much of the expenses of clearing title from the Uranium Corporation could be deducted, and that I couldn't pass on that."

On the same day, following this telephone conversation, lessee wrote a letter to lessor which contained the following:

"Following our telephone talk of this morning, I am sending you herewith the logs of our five drill-holes. * * *

" * * * This means that there is only a narrow belt of monzonite or similar intrusive. This intrusive is so slightly mineralized that I can see no chance that it contains workable ore in this area.

"I am sorry that we did not succeed in finding ore. We tried hard.

Maybe some other theory will be more successful."

On or about November 21, 1956, lessor's attorney sent lessee's attorney a letter discussing the payment that had been made by lessee but objecting to the deduction of $4,000 for the settlement of the quiet title suit and objecting to the apportionment of the expenses, contending that a lesser amount should be charged to lessor. No objection was made in this letter as to the failure to receive a quitclaim deed.

In a letter of January 4, 1957, there was forwarded from lessee to lessor an additional check in the sum of $1,286.52, the statement being made in the letter, "This check is in addition to our payment dated November 6, 1956, * * * in the amount of $3,932.15, and covers an error made in computation."

A day or two after the November 5 letter, lessee sent a copy of this letter to an agent of his, and requested that this agent take care of sending the quitclaim deed. Due to an oversight of this agent of lessee, no quitclaim deed was ever sent. However, at no time up until April, 1957, was there any demand made by lessor or his attorneys upon lessee or his attorneys for such a quitclaim deed. Subsequent to the letter of November 5, 1956, there was no mention made of a quitclaim deed by one party to the other until April, 1957.

In this regard, the evidence showed that lessor in talking to his own attorney in November, 1956, told him that he "didn't want to demand a quitclaim deed."

At the trial of the case, the lessor gave the following answers on cross-examination:

"Q. Mr. Albert, did you at any time, either personally or through agent or attorney, state expressly

[1.] The agreement recognized that there were certain title defects in the property and that any legal expenses incident to clearing this title which were paid by the lessee should be deducted from future payments to lessors, "prorated over one year's payments as they become due."

The Court found that the amounts which the lessee had theretofore expended for clearing the title were "$4,000 paid in settlement of an action to quiet title to the premises, and $601.77 paid on account of attorney's fees and costs in the quiet title action."

or indicate in any way to Mr. Joralemon or any of his agents, prior to Mr. *Conner's* letter dated April 16th of 1957, which is Exhibit 7 in evidence, did you ever before that time ever make any such indication that you took the position that this lease and option could not be terminated except after all payments had been made on that quarterly payment and after a quitclaim deed had been executed and delivered to you?  A. \* \* \* No.

"Q. Prior to that time did you or anybody on your behalf ever request or demand a release or quitclaim deed on this property?  A.  No."

On April 16, 1957, more than five months after receipt of lessee's "notice of termination" of November 5, 1956, Mr. Conner, the lessor's attorney, wrote to lessee that lessor was taking the position that the lease was still in full force and effect, and made demand for five monthly payments of $1,000 (December, 1956, through April, 1957) and the quarterly payment of $7,000 claimed to be due on February 8, 1957. The contention was made for the first time that the letter of November 5th did not comply with the provisions of Paragraph 3 of the agreement as no quitclaim deed had been delivered to the lessor.

On May 31, 1957, lessee mailed lessor a quitclaim deed provided for in Paragraph 3 of the lease and on the same day filed this action, seeking a declaration of the parties' rights under the lease, and, pursuant to a term of the lease, deposited $23,000 in escrow in a bank in Tucson pending determination of the rights of the parties.

The District Court found that it was the intention of the parties that lessee could not terminate the lease before, nor until, he had made the first quarterly payment and executed and delivered the quitclaim deed called for by Paragraph 3 of the lease.  However, the Court further found that on receipt of lessee's letter of November 5, 1956, the lessor knew the lessee was attempting to, and claiming the right to, terminate the lease without first making the payment and delivering the deed, that the lessor acquiesced in the termination of the lease, and that about November 16, 1956 (the date of the telephone conversation and lessee's second letter to lessor), lessor *recognized that lessee's interest in the property was ended.*

We think the District Court's conclusion that the lessor waived the provisions of Paragraph 3, and that the findings on which his conclusion was based, are consistent with the evidence and in accord with law.[2]

▮▮  Waiver is generally defined as "an intentional relinquishment of a known right." Williston on Contracts (Rev.Ed. 1936) § 678. Whatever the imperfections of this definition, Williston, supra, § 678 et seq., it has been accorded general acceptance in Arizona. "As the jurisdiction of the District Court derives from diversity, the meaning of the contract and the rights flowing from it are governed by State law." Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 1949, 178 F.2d 541, 545, 546; Angel v. Bullington, 1947, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832.

▮▮  At least two Arizona cases say that waiver must be upon a consideration, or the act relied on must be such as to constitute an estoppel. Guarantee Title & Trust Co. v. Babbitt Bros. Trading Co., 1936, 47 Ariz. 47, 53 P.2d 734; Davis v. Standard Accident Ins. Co., 1929, 35 Ariz. 392, 278 P. 384. But the rule is more frequently, and more recently, stated as follows, as in City of

2. The lessee on this appeal contends that we may affirm the judgment on a ground not assigned by the District Court; i. e., that payment and delivery should not be regarded as conditions precedent to termination. However, as we are in accord with the District Court's findings and conclusions and find them sufficient to support the judgment, the questions raised by this contention need not be considered.

Tucson v. Kóerber, 1957, 82 Ariz. 347, 356, 313 P.2d 411, 418:

> "[A] waiver is a voluntary and intentional relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such right."

To the same effect are Waugh v. Lennard, 1949, 69 Ariz. 214, 211 P.2d 806 and Home Owners' Loan Corporation v. Bank of Arizona, 1939, 54 Ariz. 146, 94 P.2d 437. Waiver may be inferred from conduct, and is a question of fact. Home Owners' Loan Corporation, supra.

The District Court, the trier of fact, found that the lessor acquiesced in the termination of the lease, and concluded that the lessor had waived the conditions of Paragraph 3 of the lease. He inferred this from the conduct of the lessor inconsistent with assertion or retention of his right to demand (1) payment of the first quarterly rental payment in full and (2) delivery of the quitclaim deed as conditions precedent to termination of the lease by the lessee.

It is apparent from lessee's letter of November 5, 1956, that he intended thereby to "surrender the lease," but without yet having either made payment or delivered the deed. And it is plain from his letter of November 16, following the telephone conversation of the same day, that he did not intend to work the claims further. He said he was sorry he and his associates did not succeed in finding ore, that they had tried hard, and that perhaps some other theory would be more successful. This letter, taken with his letter of November 5, together with the fact he immediately moved off the land and never returned, is consistent with the District Court's finding that he was claiming the right to terminate the lease without having complied with the conditions of payment and delivery.

In his telephone conversation with lessee on November 16, 1956, the lessor said nothing inconsistent with the lessee's attempt to terminate the lease without compliance with the conditions. In fact, he asked for copies of the drilling logs in possession of lessee. Though he had the right, under the lease, to development reports, the fact that he chose this time to ask for the drilling logs, with no indication he opposed lessee's claim of right to terminate, lends additional support to the District Court's findings and conclusions.

Finally, it was not until April 16, 1957, that lessor made any demand for any of the five monthly rental payments of $1,000 each, which, according to lessor's theory that the lease had not been terminated, had fallen due each month from December, 1956, through April, 1957. Similarly, nothing had been said until April, 1957, about the second quarterly rental payment, which, under the same theory, had fallen due on February 8, 1957. Though, as lessor suggests, a promisee may be under no obligation to demand performance admittedly due, the fact that he let the months slip by without a word about these alleged obligations, in contrast with his perseverance in seeking full payment of the first quarterly rental payment, lends additional support to the initial finding that he acquiesced in lessee's prior claim of termination, and justifies the inference he continued to do so.

■ Findings of fact of a trial Court shall not be set aside unless clearly erroneous. Federal Rule of Civil Procedure, rule 52(a), 28 U.S.C.A. We hold there was evidence sufficient to support the District Court's findings that lessor knew, on or about November 5, 1956, that lessee was claiming the right to terminate the lease without complying with the conditions precedent to termination, and that about November 16, 1956, lessor recognized that the lessee's interest in the premises was ended.

■ Waiver and estoppel are sometimes viewed as two sides of the same coin; i. e., a party *waives* a right, thus is *estopped* to assert it.[3] Although the

3. E. g., in Holmes v. Graves, 1957, 83 Ariz. 174, 318 P.2d 354, 355:

"Statutory provisions enacted for the benefit of individuals may be so far

District Court does not mention estoppel in his findings or conclusions, we believe his findings justify our holding that the lessor is estopped from asserting the conditions precedent to termination. In Holmes v. Graves, 1957, 83 Ariz. 174, 318 P.2d 354, 356, the Supreme Court of Arizona said:

> "Estoppel will be applied to prevent injustices * * * and to transactions in which it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced."

The well-supported finding that the lessor acquiesced in the termination of the lease precludes him from later assuming a position inconsistent with his acquiescence and tacit recognition that lessee's interest in the premises was ended. City of Tucson v. Koerber, supra.

Taking either the view that waiver is simply such conduct as warrants an inference of the relinquishment of a known right, City of Tucson v. Koerber, supra,

or that waiver must be upon a consideration or that the act relied on must be such as to constitute an estoppel, the findings of the District Court compel affirmance.

Appellant urges that the lessee is not entitled to invoke the doctrine of waiver because it was not pleaded in his complaint.[4]

Whether the issue of waiver was raised by the pleadings we need not decide, as the issues of both estoppel and waiver were clearly before the Court,[5] and much of the evidence upon which the District Court predicated his finding of acquiescence was introduced and received without objection by the lessor.

The issues were tried with the implied consent of the parties and must be treated as if they had been raised in the pleadings. Federal Rule of Civil Procedure 15(b).[6] Pasquel v. Owen, 8 Cir., 1950, 186 F.2d 263, at page 271.

The judgment of the District Court is affirmed.

---

waived by those for whose benefit they were enacted that they are estopped to insist upon their protection." [Emphasis supplied.]

4. True, it was not pleaded specifically by name. However, in Paragraphs 8 and 9 of the lessee's complaint the facts of the failure of lessor to demand a quitclaim deed or to indicate in any manner that they took the position the lease was still in effect, were set out.

5. The following transpired during direct examination of lessee:

"Q. If you had received a request or demand for a release of quitclaim deed from Mr. Albert or anybody acting on his behalf, what would you have done?

"Mr. McCarty: I object on the ground that is a wholly immaterial question, if the Court please, to ask what a witness would have done if something would have happened.

"The Court: Objection sustained.

"Mr. Dolph: If the Court please, may I be heard on that? We have a question of waiver or estoppel in connection with this. I think we have a right to prove that Mr. Joralemon stood ready, willing and able to furnish anything that was requested at any time, and that he would

have done so had it been requested. [Emphasis supplied]

"Mr. McCarty: Whether or not the facts of the case are such as to prove a reliance on the conduct of another is a matter to be found from the facts and circumstances of the case, not the witness' self serving declaration that 'I relied on so and so.' That is the ultimate fact in the case to be determined from the circumstances.

"The Court: I am going to let it stand. I am going to let him answer it * * *."

6. Rule 15(b) provides:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. * * *"

The Arizona rule seems to be in accord with the Federal rule. Brown v. Beck, 64 Ariz. 299, 169 P.2d 855.