449 P.2d 616

The CITY OF TUCSON, a municipal corporation, Appellant,

v.

Guy SANDERSON, individually and as Surviving Spouse of Marion Sanderson, Deceased, Appellee.

Guy SANDERSON, individually and as Surviving Spouse of Marion Sanderson, Deceased, Appellant,

v.

PIMA COUNTY, a body politic, Appellee.

No. 8504.

Supreme Court of Arizona.

In Division.

Jan. 22, 1969.

Rehearing Denied March 4, 1969.

Calvin Webster, then City Atty., Tucson, by Jay M. Abbey, then Asst. City Atty., for appellant, City of Tucson.

Rees, Estes & Browning, Tucson, for Guy Sanderson.

Robert N. Hillock, Tucson, for appellee, Pima County.

McFARLAND, Justice.

Plaintiff Guy Sanderson brought an action for the wrongful death of his wife against the City of Tucson, Pima County, and the State of Arizona. The State was dismissed as a defendant, and no appeal was taken from that order. A jury returned a verdict for $85,000 against the City and County. On motion of the County, the judgment against it was vacated,

and a judgment notwithstanding the verdict was entered in its favor. Plaintiff appealed. The City also appealed from the judgment against it, but while the appeal was pending it paid plaintiff $60,000 for a dismissal of its appeal and for a covenant not to sue. The present appeal, therefore, involves only the question of whether the trial court was correct in granting the County a judgment notwithstanding the verdict.

The County moved for a directed verdict at the close of plaintiff's case, and again at the close of all of the evidence. On each occasion the trial judge indicated that he believed that the motion was good and should be granted, but because of the length of the trial he thought that it would be desirable to let the jury render a verdict. If the jury found for the County, there would be no problem; if it found against the County, the verdict could be changed by granting a judgment notwithstanding the verdict. In either case a costly retrial of the issues would be avoided in the event of a reversal.

The issue on appeal is: Was there substantial evidence from which the jury reasonably could have found that Pima County was negligent and that such negligence contributed to the death of plaintiff's wife? The question is almost entirely one of fact, so that a detailed recital of the facts is necessary.

■ Motions for judgment notwithstanding the verdict are authorized by Rule 50(b), Rules of Civil Procedure, 16 A.R.S. We have held that in considering such a motion we must consider the evidence most strongly in favor of sustaining the verdict of the jury and will indulge in all reasonable inferences to support it. Glowacki v. A. J. Bayless Markets, 76 Ariz. 295, 263 P.2d 799. Applying these principles, the facts are as follows: .

Nearly every summer the Tucson area is subjected to "high intensity" storms—i.e., rainstorms in which the amount of rain received in a very short time is comparatively high. In those storms, water cannot be carried away fast enough to prevent it from flooding certain areas. Davis-Monthan Air Base and the city are in the same watershed, and all water falling on the base and on the land between it and the scene of the accident have always drained from southeast to northwest—into Arroyo Chico.

In any rainstorm, the amount of "runoff" is determined not only by the amount of rain that falls, but also by the nature of the ground on which it falls. Soft earth, covered with vegetation, will absorb and hold much of the rain that falls. Buildings, paved streets, parking lots, airplane runways, etc., reduce the area that would otherwise absorb water, and replace them with impervious materials. The more such improvements increase the more the runoff increases.

In the parts of Arizona where rainfall is sparse and infrequent—including some urban areas such as Tucson—it formerly was felt that the damage and inconvenience of some flooding was more acceptable than the expense of extensive sewer and drainage systems. Thus, the City of Tucson for some years allowed the runoff from the southeast to drain into the 17th St. Wash. This channel entered Tucson Boulevard at Winsett Street, where the waters carried by it made a 90-degree turn to flow north on Tucson Boulevard which was slightly lower than the abutting land and served as a channel to carry the water north into Arroyo Chico. To increase the water-carrying capacity of Tucson Boulevard, a ditch was dug along the street's west side. Tucson Boulevard dipped considerably at the point where 17th Street Wash crossed it, so that in nearly every rainstorm the street's surface, there, was under water as the runoff carried by the wash crossed the boulevard and entered the ditch on the west side of the road.

As time went on, this arrangement became more and more unsatisfactory. The tremendous increase in automobile traffic on the city's streets was accompanied by great surges of home building, commercial

building, street paving, black-topped parking lots, etc. At the same time, the Air Base was extending its paved runways, hangar capacity, etc. Engineering studies were made by various experts, and the runoff was at first estimated to be about 5,000 cubic feet per second (f/s). Studies showed that this amount was growing, and the latest figure that was used for planning was over 13,000 f/s. The area west of Tucson Boulevard and north of 17th Street was developed as a housing project by the federal government. As flood waters kept increasing, these houses appeared to be in danger of being flooded because Tucson Boulevard, and the ditch along its west side were insufficient to contain the runoff. A dike was therefore built by the federal government on the west side of the ditch so that when the ditch overflowed it would do so only toward the east. While this protected the housing development, it increased the depth and turbulence of the water flowing north on Tucson Boulevard to Arroyo Chico, and made the point where the accident occurred a dangerous place to cross when under water.

The City of Tucson was prepared for trouble at this spot and at other places in the city which were subject to flooding. It had barricades, warning flares, trucks, and a number of employees with standing orders to report for duty at the first sign of rain, without being called, pick up the flares and barricades, and place them so as to warn motorists not to enter these low areas.

In August 1961 plaintiff, his wife, and several other passengers drove north on Tucson Boulevard. They saw no barricades or flares. As they entered the submerged portion of the street, plaintiff decided that it might be dangerous to proceed and tried to turn back. In doing so, his front wheel slipped into the ditch which he did not know was there. The waters were deep, swift, and rising, and before anything could be done, his wife was washed out of the car, carried 23 miles west down Arroyo Chico, and was drowned.

In his pre-trial memorandum, plaintiff stated that his position against the County was as follows:

"1. Knowledge and notice of an appreciable risk of harm to persons within the City of Tucson by reason of the failure of said County to adequately provide, maintain, design and control artificial water ways within the County, thereby causing large amounts of water to be cast upon the said City and cause or contribute to the death of the said decedent;

"2. Failure to complete the project undertaken to prevent the condition which caused or contributed to the death of the said decedent;

"3. Improper and negligent construction of drainageways within Pima County so as to cause waters to be cast upon the said City;

"4. Failure to take corrective action for a known dangerous condition."

In his brief filed in this Court, plaintiff made the following admissions:

"(1) The site where the car went into the water was—and had been for several years—wholly within the City of Tucson;

"(2) Waters from Davis-Monthan Air Base (a Federal enclave within Pima County) and waters between Davis-Monthan and the accident site reach the site of the accident and reached there prior to the building of the County channel;

"(3) A channel (built, maintained and controlled by the County) was built on Davis-Monthan with a design capacity of 1000 c.f.s.;

"(4) That this channel had spillways which intentionally discharged some waters which reached the site of the accident;

"(5) Admit that any acts or omissions of the County were outside the Tucson City limits."

Plaintiff, in his brief, admits "arguendo" that if the County had done nothing, no

liability could attach. The rule of law applicable to Pima County is the same as that applied to municipal corporations in the case of City of Tucson v. Koerber, 82 Ariz. 347, 313 P.2d 411, in which we said:

"Inherent in the view herein expressed are certain obvious limitations to the city's liability. We have heretofore defined flood waters as being those waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81. Since the city, by covering over the arroyo and providing culverts has only attempted to control the flow of waters within the arroyo, it has assumed no responsibility for water which naturally leaves the channel and, therefore, is not liable for the damages caused by flood waters. The city's immunity from liability for damages caused by flood waters is absolute unless some other act or acts of the city caused or contributed to the overflow." 82 Ariz. at p. 351, 313 P.2d at p. 414.

There was no duty upon the County to do anything to relieve the hazard of the flooding of Tucson Boulevard where the City had deliberately used the street as an open storm sewer to carry off flood waters during high-intensity storms.

Plaintiff has pointed out no case indicating that the County had a duty to prevent flood waters from entering the city limits as they had done from time immemorial, and we have not been able to find any such authority.

But plaintiff contends the County, though it need not have acted, did in fact act by building a diversion ditch just outside of and along the southeast city limits to remove from the Tucson drainage system some of the runoff water from Davis-Monthan Air Base. Though the County was a mere volunteer, argues plaintiff, having undertaken to act, it had to act with due care, and it failed to do so in two particulars:

(1) It did not make the ditch large enough, and

(2) It did not make it strong enough.

Plaintiff cites Taylor v. Roosevelt Irr. Dist., 72 Ariz. 160, 232 P.2d 107, in which we held that, while the Roosevelt Irrigation District had no duty to fence the canal, had it not done so it would not have been guilty of negligence; however, when it erected the fence for the purpose of preventing cattle from entering the canal and being trapped there, and plaintiff relied upon the fence for protection of its cattle, and defendant thereafter negligently caused it to be partly destroyed and had full knowledge but gave no notice to plaintiff of its action, the plaintiff was ignorant of the fact; then, under those circumstances it was liable and, while it was not bound to continue maintaining the fence, it was bound to see that reasonable notice was given that it did not intend to do so. The facts in the instant case do not support an assumption by the County to protect the plaintiff from floods, nor does the evidence show that he relied on any such assumption.

Plaintiff also cites personal-injury cases in which he relies on concurrent acts of negligence. These cases are likewise not applicable in view of the facts in the instant case. The evidence does not justify a finding that the County assumed the responsibility of controlling the flood. It only undertook to alleviate the situation by building a ditch which would carry some 1,000 f/s of the flood water. In City of Tucson v. Koerber, supra, we held that, even though a municipal corporation has no duty to keep a stream flowing in safe condition and protect private property from overflow, if it assumes to act it must act without negligence; so, in the instant case, the only theory under which the County could be negligent would be if it were negligent in the construction or maintenance of the ditch.

In the instant case we have examined the entire 1,200-page transcript, and find no evidence of negligence on the part of

the County. Engineers were called by both plaintiff and the County, and they testified in great detail concerning the diversion ditch built by the County outside the city limits along the northern border of Davis-Monthan Air Base. The evidence is un-contradicted that the County—even though under no duty to control the runoff waters —tried to alleviate the situation by building the ditch.

Glenton Sykes, Tucson City Engineer at the time of the accident, was called by plaintiff and testified that the entire drainage system of the city was inadequate; that in every major storm Tucson Boulevard was inundated and was used as a drainage ditch; that the main reason for the flooding of the street was the erecting of the dike which prevented water in excess of the capacity of the ditch along Tucson Boulevard from overflowing to the west; that the ditch along the street was never enlarged because the long-range plans of the federal government would eventually divert most of the water; that plans and studies of the project were nearly ready to be executed after the passage of nearly twenty years; that large engineering projects, such as the diversion of Davis-Monthan runoff, are generally done in stages as the money becomes available; that the ditch actually constructed by the County was the first stage, and that it was designed to carry only 1,000 f/s of runoff, that it was believed that even this amount of water, when diverted from Tucson Boulevard, would be a great help in diminishing the size of flood created on that street by every major storm; that the diversion ditch built by the County actually kept 2,600 f/s from reaching Tucson Boulevard, though it was designed to carry only 1,000 f/s; that it takes years to complete plans, get the Congress to allot the funds, and to "breathe life" into a large project.

Walter Burg, County engineer at the time of the accident, was called by plaintiff and testified that the runoff the night of the accident set a new record; that the County maintained 24-hour surveillance over county roads; that he went, that night, to the diversion ditch built by the County and found a "small breakthrough" and immediately called and supervised a crew of men to seal off the leak by filling the spot with sandbags; that the County knew that a ditch carrying only 1,000 f/s was inadequate, but that it was better than nothing and would give some relief until the federal project got under way; that the breakouts were slight, and that very little of the water that broke out reached Tucson Boulevard; that the water that did reach Tucson Boulevard came from places other than from the County's ditch; that the County at one time asked both the City and the Air Base to contribute funds to make a quicker and more adequate start while waiting for the complete project, but both refused; that spillways were provided in the ditch to assure that the water above the 1,000 f/s capacity left the ditch at places least likely to add to the flood danger; that "there was only one spot where water got through, and we plugged that before it caused any serious damage."

A consulting engineer, Lawrence Henry, testified that the complete concept, the limitation of capacity to 1,000 f/s, and the use of spillways were all sound engineering concepts; that the ditch built by the County led a large amount of water to a detention basin and markedly alleviated the flooding of Tucson Boulevard, and thus did the job it was designed to do; that the runoff just from the land below the County's ditch was enough to overtax the Tucson Boulevard crossing; that even if the spillways and breakouts in the ditch had contributed 1,300 f/s to Tucson Boulevard, it would have first spread over and flooded large areas so as not to raise the water level on that street very much.

Paul Cella, an engineer called by the County, testified that 2,700 f/s comes to Tucson Boulevard from land below the County's ditch and that the capacity of the Tucson Boulevard ditch was only about 200 f/s.

George Grove, an engineer called by the County, testified that even after the big over-all project of the federal government is completed, Tucson will continue to have a flood problem on Tucson Boulevard because of runoff from lands below the project; that the leak in the County's ditch was small, and that the water that passed through it would not have gone to Tucson Boulevard the night of the accident.

█ It is therefore very clear that the County undertook only to remove 1,000 f/s from the total amount of water that theretofore had reached 17th Street and Tucson Boulevard; that it succeeded in doing so, and that the net result of building the diversion ditch was to alleviate the situation at the scene of the accident. It is equally clear that even if the ditch did suffer from one or more breakouts, such condition was not shown to have been due to the County's negligence. Plaintiff's counsel, in his opening argument, characterized the storm as a "cloudburst," and testimony showed that the amount of runoff broke all previous records.

█ Having pleaded specific negligence, as appears by the position taken by him in his pre-trial memorandum, plaintiff cannot now rely upon res ipsa loquitur. Hall v. Delvat, 95 Ariz. 286, 389 P.2d 692. Even if plaintiff had relied upon that doctrine, it is doubtful whether it would have been applicable to the cloudburst involved here. In any event, the burden was upon plaintiff to prove the specific negligence alleged, and he has failed completely in his effort to meet that burden.

Since there was no evidence of any kind of negligent conduct on the part of the County, the judgment notwithstanding the verdict was properly entered.

Affirmed.

STRUCKMEYER and HAYS, JJ., concur.