[Civ. No. 7351. Third Dist. June 30, 1947.]

JOHN COSTELLO et al., Respondents, v. FRANCIS PERRY BOWEN et al., Appellants.

W. A. McGugin for Appellants.

C. Ray Robinson, Samuel V. Cornell and Margaret A. Flynn for Respondents.

THOMPSON, J.—The defendants have appealed from a judgment restraining them from constructing, or maintaining, a dike, dam or other obstruction on their land in Merced County in or across a "natural water course or drainage channel," designated as "Snake Slough," in such a manner as to "interfere with the natural flow or elevation of water in said 'Snake Slough' or in such manner as to cause water to flow onto, . . . flood or become or remain impounded upon the lands of the plaintiffs."

The appellants contend that the complaint fails to state facts sufficient to constitute a cause of action; that the findings of fact do not support the conclusions of law; that the evidence fails to support the judgment, and that the injunction is ambiguous and too broad in its terms, since, in effect, it unlawfully prevents the defendants from protecting their land from unusual "flood waters."

The railroad track of the plaintiff, Southern Pacific Company, extends in a southeasterly direction from the city of Merced. For many years that company has leased from the Central Pacific Railway Company the land upon which said railroad track is constructed, and over which the lessor has operated regular daily passenger and freight trains.

At a distance of about 5 miles southeast from Merced the railroad track crosses the natural water channel called Snake Slough, by means of a bridge 40 feet in length. A double-lane state highway, number 99, extends adjacent to and parallel with the railroad right of way in that vicinity, on the northerly side thereof. The state highway also crosses the channel of Snake Slough by means of a bridge. Snake Slough is one of three streams which flow in parallel courses about one-half mile apart, which for many years past have

served to drain the district north of said right of way. The most northerly of those watercourses is Owens Creek. To the south of Snake Slough is Mariposa Creek, sometimes called Duck Slough. Those watercourses converge at some distance south of the railroad track, and Owens and Mariposa creeks flow into the San Joaquin River. During the rainy season Owens Creek and Mariposa Creek sometimes overflow into Snake Slough.

For more than 14 years the plaintiffs, Mr. and Mrs. Costello, and Mr. and Mrs. Heetter, have owned and resided on their separate properties north of the said railroad track and state highway, adjacent to Snake Slough near the point where that watercourse flows under said bridges. During all of said time Snake Slough served as a drainage canal for the protection of plaintiffs' properties.

In 1942, the defendants purchased 60 acres of land adjacent to the railroad right of way, on the southerly side thereof, across which property Snake Slough flowed unobstructed for many years. In 1944, the defendants constructed and thereafter maintained a dam or dike about 4 feet in height across the entire channel of Snake Slough, on their land, just south of the railroad bridge, thereby obstructing the flow of water in that channel and causing it to overflow and flood plaintiffs' lands to their damage.

This suit for injunction to restrain the maintenance of said dam, and for damages, was then commenced. The defendants answered the complaint, merely denying the material allegations thereof. No demurrer to the complaint was filed. The cause was tried with a jury, to which special issues were submitted. A verdict was returned favorable to the plaintiffs on all issues. The court thereupon adopted findings favorable to the plaintiffs and rendered judgment restraining the defendants from maintaining the dam over or across said "natural water course or drainage channel" so as to obstruct or interfere with the *natural flow of water* and to cause the water to flood or flow upon the lands of plaintiffs. No damages were allowed. From that judgment this appeal was perfected.

We are of the opinion the complaint states a good cause of action for injunctive relief to restrain the defendants from constructing or maintaining the dam in question as an obstruction to the "natural water course or drainage channel" called Snake Slough, so as to cause the overflowing and flooding of plaintiffs' lands to their damage.

Paragraph VII of the complaint alleges that Snake Slough is a "natural water course and drainage course or channel," which flows adjacent to the lands of plaintiffs, Mr. and Mrs. Costello, and Mr. and Mrs. Heetter, and under the bridges across the rights of way of the state highway and the Southern Pacific Company, and thence over and across the lands of the defendants. Paragraph VII of the complaint asserts that "plaintiffs have been and now are entitled to the natural and unobstructed flow of water in and through said Snake Slough through, from and over their several lands and over and along and upon defendants' lands." Paragraph VIII of the complaint alleges that defendants constructed the dam in question in 1944 "through, over and upon said drainage channel at a point on defendants' lands near said railroad" so as to "obstruct and stop the natural flow of water in and through said drainage channel and to raise the surface of said waters above the ordinary level thereof and to cause such water to back up onto and accumulate upon plaintiffs' lands and upon said railroad and to flood the same, thereby softening, undermining and damaging" the same.

It is true that paragraph VII of the complaint also alleges that said Snake Slough served as a natural drainage channel to protect said lands from "*flood* and surface waters" for a period of "more than five years last past." We may assume the preceding allegation was an ineffectual effort to assert a prescriptive right to enjoin defendants' right to protect their land from "flood and surface waters." But the allegation with respect to "flood and surface waters" is immaterial, and may be disregarded as surplusage, since the separate allegations with respect to obstructing the natural flow of water in a drainage channel, by means of a dam which caused the flooding and overflowing of plaintiffs' land to their damage, states a valid cause of action independently of the ineffectual cause based on *flood* and surface waters. The defendants failed to demur to the complaint, or to move to strike out such immaterial portion thereof. The plaintiffs relied on their right to enjoin defendants' interference with the ordinary flow of water through the natural channel of Snake Slough. The unnecessary allegations of the complaint with regard to the flood and surface waters were properly disregarded by the court in its conclusions of law, in rendering judgment and in granting injunctive relief. Regarding the right of the court to disregard allegations of a complaint which are unnecessary

and superfluous, when a valid cause of action is otherwise adequately stated, it is said in 1 Bancroft's Code Pleading, section 27, at page 63, that:

"Surplusage is matter altogether superfluous and useless,—matter not essential to the claim or defense. Such matters do not vitiate the pleadings, and, although not stricken out, need not be proven but may be ignored altogether, provided the facts stated otherwise are sufficient to constitute a cause of action under the law upon which the plaintiff relies. Under the head of surplusage may be included, . . . unnecessary allegations, extraneous or immaterial matters."

We conclude that the complaint states a valid cause of action independently of the allegations in paragraph VII, regarding the flood and surface waters. That issue is immaterial.

Moreover, it will be observed that the language of paragraph VII of the complaint, to which objection is made, combines the terms "flood and *surface* waters," in claiming that plaintiffs have acquired prescriptive rights to the unobstructed use of Snake Slough channel for the protection of their lands against flood and overflow water. There is a clear distinction between unusual vagrant flood waters and mere surface waters with respect to the use and control of such waters by landowners. (1 Kinney on Irr. and Water Rights, 516, §§ 318, 319; *Weinberg Co. v. Bixby*, 185 Cal. 87, 96 [196 P. 25]; *Everett* v. *Davis*, 18 Cal.2d 389, 393 [115 P.2d 821]; *Sanguinetti* v. *Pock*, 136 Cal. 466 [69 P. 98, 89 Am.St.Rep. 169].) In the Sanguinetti case, *supra*, it is said that while a lower owner of land may adopt reasonable means of protecting his land from unusual *flood* water which causes the overflowing of a natural stream, the upper owners have an easement for the unobstructed discharge of surface water, caused by rain or the melting of snow, into the channel in its natural and usual flow, and that the lower landowner has no right to intercept, divert or obstruct such *surface* water in its accustomed flow, to the injury of the upper owners of land. But the distinction between the rights with respect to the diversion from a natural stream of flood and surface water is immaterial in this case since the judgment does not affect *flood* water if any such existed. It may reasonably be assumed the witnesses did not use the term "flood water" in its technical legal sense, but rather with reference to the result of unusual precipitation of rain water which was ordinarily carried in

Snake Slough channel, except for the unlawful obstruction by the defendants.

In support of the apparent conclusion of the court that "flood water," in the technical sense of *fugitive water* against which a landowner may defend his property, was not involved in this case, defendant's witness, Edward McDonald, testified:

"Q. So that when you say that there were *flood waters* there, you mean they were partly high waters from the rainy season and maybe some water that come over from Mariposa Creek, isn't that what you mean? A. That is right, we never try to distinguish flood water from rain water because we figured it was all rain water to begin with anyway."

The trial court determined that Snake Slough is a natural watercourse and drainage channel. While there is a conflict of evidence in that regard, there is ample proof to support that finding. It is difficult to define the term "water course" in language that is uniformly applicable, since the topography and surrounding conditions which contribute to its existence vary greatly. In general terms it has been said to consist of a running stream of water following a regular course or channel and possessing a bed and banks. (*Los Angeles Cemetery Assn.* v. *City of Los Angeles*, 103 Cal. 461 [37 P. 375] ; *Sanguinetti* v. *Pock, supra;* 44 W. & Ph. perm. ed. 724.) It is the channel through which the water of a particular district or watershed usually or periodically flows. While it is ordinarily defined as a stream, containing a definite bed, banks and channel, which flows into some other river, stream, lake or the sea, none of those characteristics is an absolute fixed factor. A watercourse may exist even though it serves as a mere channel by means of which a particular watershed is drained, and although it may be dry in certain seasons, or despite the fact that it may not empty into any other river, stream, lake or body of water, but, on the contrary, even though it terminates in some sandy basin where it disappears from sight. (See 25 Cal.Jur 1032, §§ 31-38.) The question of the existence of a watercourse is often one of fact to be determined by a jury or the court. If the evidence in that regard is conflicting, the determination of the trial court will not be disturbed on appeal. (*County of Sierra* v. *County of Nevada*, 155 Cal. 1, 8 [99 P. 371].)

Regarding the nature of Snake Slough as a watercourse or channel which served to drain the area north of the

railroad right of way, Delores Heetter, testified that for many years she had observed that the water from north of the highway "would flow and go right in there in that slough, fall back in that slough. . . . Q. You think all the water that falls up north . . . comes out under the same trestle of this slough? A. Same trestle of this slough." The maintenance of those 40-foot bridges over that channel for many years furnishes some evidence that it was a defined watercourse. The plaintiff, John Costello, testified that Snake Slough for more than 14 years to his knowledge had served as a watercourse to drain the area north of the track. This colloquy occurred:

"Q. And do you know from your 14 years experience and observation what the general fall of the county is there to the north of the right of way particularly? A. Yes, it all falls in a southwesterly direction, the natural fall of the land. Q. With the result that rains or waters falling in that area would normally flow in what general direction? A. It would all fall down into this slough from all around. . . . Q. So that if the waters were left unobstructed that fell in that area, where would they flow or pass to? A. Pass under the highway bridge and under the railroad trestle and out this way, keep going in a southwesterly direction. I don't know where they end up. They always went through there. Q. . . . How many years have you seen water flowing in the manner that you have described there? A. Practically every year, whenever there are any heavy rains at all."

On cross-examination Mr. Costello further testified:

"Q. Have you ever, during these times of flood over from Duck Slough [Mariposa Creek] and these heavy rains, have you seen the amount and quantity of water that entered upon Mr. Bowen's place? A. I have just seen it going under the bridge, flowing through there. I don't know where it all come from. I didn't try to track it up. . . . Lots of years large quantities went through there. Q. And it spread over Mr. Bowen's land? A. It didn't spread out over Mr. Bowen's land until he leveled it, when he leveled the bank, he gets it all now. Q. As that Snake Slough enters Mr. Bowen's place there is no defined banks, is there? A. No, because he took them off when he leveled his land. Q. Did you ever see them there, Mr. Costello, before he leveled? A. Yes, I did."

We conclude that the evidence supports the finding that Snake Slough is a well-defined natural channel within the

meaning of the term "water course" through which the waters of the area north of the railroad track in that vicinity were drained under the bridges and across the lands of the defendants, and that the defendants unlawfully obstructed the regular flow of that stream by constructing and maintaining the dam in question, to the damage of plaintiffs' properties.

The defendants urge this court to reverse the judgment on the ground that the findings of the court that Snake Slough is a natural watercourse, and that it is a natural channel upon which the plaintiffs relied to protect them from *flood and surface water,* are inconsistent and irreconcilable. The court did find that plaintiffs had acquired prescriptive rights to the unobstructed use of the natural watercourse to drain their lands from "flood and surface waters." But the last mentioned finding is immaterial, as we have previously said. It may be disregarded. We think it may also be reconciled with the other findings that Snake Slough is a natural watercourse, the regular flow of which was obstructed by defendants' construction and maintenance of the dam in question, to the damage of plaintiffs' land. It may be so reconciled on the theory that the term "flood water" was not used by the court in the technical sense of extraordinary vagrant water which will not return to the stream when the high water recedes, against which the lower landowners have the right to protect their property. We recognize the fact that the California rule, contrary to that of other jurisdictions, recognizes extraordinary *flood* waters as "common enemy" against the invasion of which a landowner may defend his property by the construction of *necessary defensive obstructions,* even though they may damage other riparian owners, *provided the obstructions do not interfere with the current of the water in its natural channel.* (*Weinberg Co.* v. *Bixby, supra,* at p. 95; *Hellman Commercial Trust & Savings Bank* v. *Southern Pacific Co.,* 190 Cal. 626, 634 [214 P. 46]; *Everett* v. *Davis, supra;* 16 A.L.R. 642, note.) But that rule does not authorize a landowner, under the pretext of guarding against "flood water," to construct and maintain a dam which intercepts and obstructs the entire flow of the stream in its normal condition. The rule is stated in the Weinberg case as follows:

"The doctrine of the common law relating to protection against flood overflow of rivers, and which has been adopted by the California courts, recognizes such flood waters as a common enemy which may be guarded against or warded off

by one whose property is invaded or threatened, *by obstructions which are merely defensive in their nature and not calculated to interfere with the current of the water in its natural channel.*" (Italics added.)

The foregoing fugitive flood water rule is confined by our Supreme Court in the Everett case, *supra*, to waters which have escaped from their normal channel in times of unusually high water floods, and which will not normally return to the natural channel when the waters of the stream recede. That case states, at page 393, that:

" 'Flood waters are those which escape from a stream or other body of water and overflow the adjacent territory.' (*Le Brun* v. *Richards, supra* [210 Cal. 308 (291 P. 825, 72 A.L.R. 336)].) Such waters are said to be a common enemy, against which one may protect his land even to the detriment of his neighbor. But the drastic rule which allows a property owner to divert such waters to the lands of others *only applies to flood waters in the strict sense, that is, waters escaping because of their height from the confinement of a stream and running over adjacent property.* Implicit in the definition of flood waters is the element of abnormality; they are flood waters *because of their escape from the usual channels under conditions which do not ordinarily occur.*" (Italics added.)

 Under the limitation of the foregoing rule, a lower landowner may not completely dam the natural course of a stream so as to divert the waters thereof to the damage of upper landowners, even though the flow is excessively high, for the reason that while the high waters still flow in the natural channel they have not escaped therefrom and are not deemed to be flood or vagrant waters in the strict sense. This limitation of the application of the California rule with respect to vagrant flood waters, is in accordance with our decisions. (*Hellman Commercial Trust & Savings Bank* v. *Southern Pacific Co., supra; Weinberg Co.* v. *Bixby, supra.*) In the Hellman case it is said at page 634 that, in interfering with the established natural flow of the watercourse:

". . . [I]t would follow as a matter of logical consequence that neither the defendants nor anyone else would have the right to divert either the usual or the torrential, or even the exceptional or unprecedented flow of these waters from their natural and accustomed channels to another of the courses or channels of said river, if such diversion would result in precipitating upon the lands of the plaintiff an outflow of said stream which, but for such diversion, would in the main have

pursued its way down the East Wash or channel thereof at a distance from, and without injury to, plaintiff's land.''

Likewise it is said in the Weinberg case, *supra,* that:

''We recognize the limitation in all of these cases that such right of self-protection does not permit of any obstruction of or interference with the natural channel of the stream or diversion of the flow of the water in such channel.

''The distinction, too, is recognized in this state between the flood waters of a natural watercourse, and the surface drainage arising from rain or melting snow, or springs and swamps before they have found their way to and become a part of a stream or river.

''As to such drainage our courts have adopted the rule of the civil law which places upon the proprietor of land the burden of permitting the passage over his land of the surface drainage in such a way as not to retard its flow from the lands above him, nor to concentrate and increase this flow upon the lands below.''

■ From the foregoing clear distinction between vagrant flood waters in the restricted and technical sense, and unusual and excessive flow within the natural channel of the stream, temporarily caused by excessive rain or melted snow, we conclude that the findings are not irreconcilably conflicting, and that the court was warranted in enjoining the defendants from damming the stream in its regular channel so as to interfere with its natural flow and causing it to overflow and flood plaintiffs' upper lands to their damage. ■ Findings should be read as a whole to ascertain the intention of the court. Immaterial findings may be disregarded. A judgment may not be set aside, unless the conflict is clear and the findings are incapable of being reconciled. (24 Cal.Jur. 967, § 202.) There is no difficulty in this case in reconciling the findings to support the judgment.

■ Excessive storm waters which overflow the banks of a stream, but which later find their way back into the stream either by drainage or by percolation, as the stream subsides, are not deemed to be ''flood waters'' against which an owner of land may defend his property by interfering with the natural flow of the stream even though his defensive methods may damage other owners of land, but are considered as waters of the stream, the natural flow of which may not be interfered with to the damage of upper riparian owners of land. In

1 Kinney on Irrigation and Water Rights, second edition, 519, section 319, it is said:

". . . In legal parlance 'flood waters' may be defined as those waters, caused by the melting of snows or rains, which swell and overflow the banks of the water courses, and overflow lands not usually covered even in times of high water of the streams. If the water forms a continuous body with the water flowing in the ordinary channels, or if it departs from such channels *animo revertendi*, presently to return when the waters recede, it is flood water and to be regarded as the waters of the streams, and treated in law as such."

In 26 California Jurisprudence 284, section 496, the text which is supported by numerous California authorities, declares that:

"The owner of lower land may not obstruct a natural channel followed by surface waters, or otherwise change the natural discharge of such waters to the injury of his neighbors. Nor may he dam up a natural channel, swale or other low place, so as to prevent drainage water from reaching its natural outlet. But he has a right to protect himself against surface waters which have been turned on him by artificial means, though, as just seen, he may not turn such waters on the lands of third persons. The question as to what constitutes the natural flow to which a lower owner must submit is to be determined by natural conditions, unaffected by artificial changes and without considering the effect of floods or cloudbursts."

In the case of *Cederburg* v. *Dutra,* 3 Cal.App. 572 [86 P. 838], under circumstances quite similar to the facts of this case, a judgment restraining the defendant from maintaining a dam across the channel of a stream was affirmed. The complaint alleged that plaintiffs had acquired prescriptive rights to maintain a ditch which he had constructed and used for more than 5 years to drain the water from a swale on his property into the main channel. The court adopted a finding to that effect. Like the present case, the dam which was constructed by the defendant practically shut off the flow of water into a slough which was found to be "the natural drainage" channel. Regarding the plaintiff's plea and the court's finding as to the alleged adverse use of the ditch constructed by plaintiff, the appellate court determined that:

"It is not necessary to consider whether or not the finding that the ditch cut by plaintiff has been in adverse use for more than the statutory period is sustained by the evidence.

*The findings as to the watercourse and its natural adaptation for drainage of the riparian land are sufficient to support the judgment."* (Italics added.)

In support of the findings and judgment enjoining the defendant from maintaining the dam which obstructed the flow of water in its natural channel upon and across the lands of the defendant, the court said, at page 575, that:

". . . The evidence showed that the ditch cut by plaintiff to shorten the channel at the point above defendant's land, had for its object the hastening of the flow of water at that particular point, but did not injuriously affect defendant's land. It was stated in *Sanguinetti* v. *Pock,* 136 Cal. 466 [89 Am.St.Rep. 169, 69 P. 98], as 'settled law in this state that plaintiff as the owner of the upper land has an easement over the lower adjacent land of defendant to discharge surface water as it is accustomed naturally to flow, and the defendant had no right to interrupt such flow to plaintiff's injury.' (Citing cases.) It was said in *Los Angeles Assn.* v. *Los Angeles,* 103 Cal. 461 [37 P. 375] : 'There must be a stream usually flowing in a particular direction, though it need not flow continuously. It may sometimes be dry. It must flow in a definite channel, having a bed, sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face or tract of land, occasioned by unusual freshets or other extraordinary causes.' In *Sanguinetti* v. *Pock, supra,* the opinion pointed out the features wanting to make the drainage there involved a watercourse. But here the features or characteristics of what the law defines to be watercourse clearly appear, and we think the evidence supports the findings."

The respondents concede that the injunction does not apply to flood water in its technical sense, against which an owner of land may protect his property by reasonable means which will not interfere with the regular flow of water in its natural channel. Neither the conclusions of law nor the judgment makes reference to flood water. We assume that the injunction does not affect flood water in its restricted and technical sense.

The judgment is affirmed.

Adams, P. J., and Schottky, J. pro tem., concurred.