**SUNTRANA MINING CO., Inc., an Alaskan Corporation, Plaintiff,**

v.

**USIBELLI COAL MINE, Inc., and A. Ben Shallit, d/b/a Cripple Creek Coal Company, Defendants.**

**No. 8603.**

District Court, Alaska,
Fourth Division, Fairbanks.

Jan. 2, 1958.

E. L. Arnell and George M. McLaughlin, Anchorage, Alaska, for plaintiff.

Charles J. Clasby, of Collins & Clasby, Fairbanks, Alaska, for defendant Usibelli Coal Mine, Inc.

Robert A. Parrish, Fairbanks, Alaska, for defendant A. Ben Shallit, d/b/a Cripple Creek Coal Co.

TOLIN, District Judge.

This litigation was commenced by a complaint, since amended, wherein plaintiff alleged certain hereinafter described acts of alleged continuing trespass and maintenance of a nuisance. The prayer of the complaint seeks injunctive relief and, as amended, the complaint prays for damages because of losses heretofore suffered. Both defendants raise a challenge to the jurisdiction of the Court. It is not well taken nor was it supported by citations except the lease existing between plaintiff and the United States. Following the custom of courts, this

Court will treat first of the challenge to its jurisdiction.

■ In 1925 the Healy River Coal Corporation entered into a document entitled "Mining Lease of Coal Lands in Alaska" wherein and whereby the United States of America, through the Secretary of the Interior, leased the described lands to said Corporation and granted unto it for a stated time the exclusive right and privilege to mine and dispose of all the coal and associated minerals in, upon or under the described land. By permission of the Secretary of the Interior, the lease was assigned to plaintiff and this action was brought during the term of the lease. Section 7 of Article VII *of the lease* recites, "That in case any dispute shall arise between the lessor and lessee as to any question of fact, or as to the reasonableness of any requirement made by the lessor under the provisions of this lease, * * * such questions or disputes shall be settled by arbitration in the manner provided for by this section, * * *." There then follows a detailed recitation of how arbitrators shall be selected, the extent of their duties and the binding effect of their decisions. Both defendants to this litigation insist that this provision in the lease makes it mandatory that a dispute of the character which plaintiff has brought to this Court shall be settled by arbitration. The simple and obvious answer to this contention is that this dispute is not one between the lessor and lessee. It is a dispute between the lessee and two parties whom lessee contends have trespassed and are now trespassing upon the properties described in the lease. General reference has been made, but without citation to any section, to the statutes governing coal lands in Alaska. The Court has found that Title 48 U.S.C.A. beginning at § 432 and continuing through many successive sections, relates to coal lands in Alaska, but nowhere within these Statutes has the Court found any law relating to compulsory arbitration of disputes of the character involved in this litigation. De-

fendants' jurisdictional point is, therefore, declared to be without merit.

■■ It is also contended by defendants that the plaintiff is not in fact a lessee for the reason that the document to which reference has been made is not a lease but does no more than grant a profit or license to plaintiff's predecessor and through unchallenged operation of the assignment to the plaintiff. The importance of this point inheres in both defendants' contention that a mere licensee does not have the necessary title to support an action for trespass. Section 434 of Title 48 U.S.C.A. refers to "The unreserved coal lands and coal deposits * * *", and further recites that " * * * the Secretary shall offer such blocks or tracts and the coal, lignite, and associated minerals therein for leasing, and may award leases thereof * *." Section 435 of Title 48 U.S.C.A. refers to privileges of those holding such a lease. Section 438 of the same Title refers to royalties and rentals. Section 438a deals with situations under which rentals may be waived. Section 439 is entitled "Disposal of royalties and rentals received", and throughout the coal land Sections of Title 48 U.S.C.A., the word "rentals" and other language common to leases is found. A reading of the document itself discloses that it does grant a license, more particularly, " * * * the exclusive right and privilege to mine and dispose of all the coal and associated minerals in, upon, or under * * *." But within the same sentence the following is found, " * * together with the right to construct coke ovens, briquetting plants, by-products plants, and all such other works as may be necessary and convenient for the mining and preparation of coal and associated minerals for market, * * *." It is important that the rights above referred to are exclusive to the lessee and that in one section of the document the lessee is required to pay a specified rental based upon periods of time rather than upon what is taken from the land, and in another section of the document the lessee is required to pay a royalty based

upon the quantity of coal shipped or removed from the leased lands. Not only does the instrument appear to be a combination but the parties to the document have treated it as being both a lease and a license and there is nothing in the law of leases or licenses which makes them so antagonistic that they cannot both be declared within the four corners of one agreement. That is what has been done here. Regardless of the legal label by which plaintiff's interest is classified, it is clear that plaintiff had a right to the immediate possession of the land thus fulfilling one of the classical requirements which must be shown in actions of this nature.

The Court finds that the document in evidence entitled "Mining Lease Of Coal Lands In Alaska" is in fact a lease and is also in fact an exclusive license to take coal from the land.

The more substantial controversy is the one described in plaintiff's complaint and to which practically all the evidence in the case was directed either in support or refutation of plaintiff's allegations. The issues on this phase of the case are principally factual, no one contending that the Courts will not appropriately redress the type of trespass pleaded. It appears substantially from the evidence that the Healy River is a stream flowing in a generally westerly direction, and is tributary to the Nanana River, a stream flowing northerly and into the Tanana River which is a direct tributary of the Yukon River that flows into the Bering Sea. Near the confluence of the Healy and Nanana Rivers plaintiff's predecessor developed a conventional coal mine. The mine has come by appropriate sale and assignment of the lease into the possession of plaintiff Suntrana Mining Co., Inc. The lands thereby under Suntrana's possession are riparian to the Healy River channel and are situated on both sides of, and under, the river flood plane. In the area above Suntrana's leasehold defendant Usibelli Coal Mine, Inc. has for some years been engaged in the operation of a coal mine which operates to a large extent in a different mining method. This is also true of defendant A. Ben Shallit, d/b/a Cripple Creek Coal Company. Usibelli and Shallit appear to be lessees and licensees in the same way the plaintiff enjoys those statuses. However, the peculiarity of Usibelli's and Shallit's operations is that seams of coal have jutted out of the surface of the earth and these seams extend down below the surface of the earth. All of this land is hilly or mountainous terrain with Suntrana being at the lowest point, Usibelli somewhat higher, and Shallit's operation still higher in the above-sea level reference. It has been the custom of Usibelli and Shallit to remove the earth which acted as a barrier to immediately reaching the seams of coal by the use of hydraulic mining methods. In some instances the seams have been covered in part by layers of gravel and earth, and in other instances by what is referred to in much of the testimony as sandstone. Sandstone is not a true stone at all. That term is a local name given to sand which has absorbed water and thereafter frozen. It remains in a stone-like solid state until dissolved by heart, flowing air, or water. Usibelli and Shallit have been given to exploding large charges of blasting material thereby loosening the gravel, earth and sandstone and permeating it with cracks and fissures so that the surrounding air currents would enter. The next step in the mining operation has been to play water upon this mass of overburden from large nozzles called "giants". The overburden is thus washed away from the coal seams which remain for recovery by miners without the necessity of digging tunnels. The overburden being thus separated from the large body of hill or mountain, seeks the level of the Healy River so that vast amounts of gravel, earth and melted sandstone are washed into the stream. Prior to the beginning of these operations by defendants, the Healy River was in a down-cutting geological stage but the considerable quantity of overburden, admitted by defendants to be in excess of 400,000,000 tons, has resulted in a building up of the floor of the river. The

Healy River annually is subject to a recurring and intermittent high water or flood stage, and during high water or flood stage the waters of the Healy River flow in varying depths over the whole or substantial portions of the flood plane. During such high water periods the water moves substantial but unknown quantities of solid materials downstream. Many of the materials eroded from defendants' mines by their hydraulic operations are washed away during seasons of flood. Some of these come to rest in the bed of the Healy River in such a way as to cause waters to back up. Other of the overburden washed into the river has resulted in upbuilding of the flood plane. However, in the area of the tributary Cripple Creek and of the Healy River itself above where there has been an artificial introduction of materials into the flood plane, the river and creek are still in the geological process of down-cutting or lowering.

Usibelli has been by far the greater contributor of overburden into the waters of the river. In his testimony, Mr. Usibelli, the head of the company, estimated that over 4,000,000 cubic yards of mine waste and overburden have been removed from his operation and that approximately 64,000 cubic yards have remained deposited in a pit area located on his leasehold. The remainder, consisting of 3,936,000 cubic yards, has been deposited by Usibelli into the waters and upon the flood plane of the Healy River. Much of the coal recovered by Usibelli is put through a coal washing process whereby further solids are separated from the coal. Usibelli is upstream from Suntrana's operation and the wastes from the washer plant flow into the Healy River. In his testimony Mr. Shallit estimated that his operation had deposited in excess of 200,000 cubic yards of overburden directly into the channel of Cripple Creek. Cripple Creek is directly tributary to the Healy River. Prior to Shallit's hydraulic operations,

Cripple Creek was in the same geological stage of down-cutting as the Healy River but below the point where Shallit has introduced overburden into the Cripple Creek it has accreted some of such overburden, the greater body of the overburden passing on into the Healy River and contributing to the rise of the floor of the river. The character of the Healy River has been changed below the points of both Shallit's and Usibelli's introduction of mine wastes to the point that the geologically down-cutting streams have reversed their down-cutting trends and the flood planes have been substantially raised. This has not only resulted in flood damage to Suntrana's leasehold but there is a perpetual threat of further flood damage and there has been actual trespass to the Suntrana leasehold by the deposit of Usibelli and Shallit wastes upon portions thereof. Suntrana seeks to recover damages as well as to have the protection of a permanent injunction. By consent of all parties, the question of damages was not inquired into at the trial, that issue having been severed for separate trial in event the Court should find that there has been trespass upon Suntrana's leasehold by Usibelli or Shallit or both of them.

The Court finds that both Usibelli and Shallit have committed trespass upon plaintiff's leasehold and threaten to continue to do so.

The most recent adjudication in this type of litigation within the Territory of Alaska was the case of Erceg v. Fairbanks Exploration Co.[1] The unpublished opinion of the District Court is found in the files of this District as File No. 3571. Both the District Court and the Appellate Court recognized that the situation in the Erceg case, which is analogous to that of the case at bar, was such that an injunction would issue to to restrain further conduct of the type complained of. Not only well understood principles of equity but many judicial declarations and applications have

1. 9 Cir., 1938, 95 F.2d 850, 9 Alaska 264, certiorari denied 305 U.S. 615, 59 S.Ct. 74, 83 L.Ed. 392.

548

served to prevent other operators from like conduct. See City of Oroville v. Indiana Gold-Dredging Company.[2] Injunctive relief was also granted in Costello v. Bowen.[3] This principle has not been applied exclusively in Alaska and California but has been of general application wherever equitable principles are applied by courts. In 1888 a court in Vermont applied it in Goodrich v. Dorset Marble Company.[4] See also, Guynn v. Wabash Water and Light Company,[5] where it was said, "The general rule of property is applicable to a riparian proprietor, and he is restricted in the management of his property by such rule. 'So use your own as not to injure others.' "

Plaintiff is entitled to a Judgment restraining defendants from depositing overburden or mine wastes into the Healy River, or placing such overburden and mine wastes so that they will be washed into the Healy River.

Judgment will await the decision of the issues remaining to be tried.

2. C.C.1908, 165 F. 550.

3. 1947, 80 Cal.App.2d 621, 182 P.2d 615.

4. 60 Vt. 280, 13 A. 636.

5. 1914, 181 Ind. 486, 104 N.E. 849.