379 P.2d 135

The GILLESPIE LAND AND IRRIGATION COMPANY, an Arizona corporation,

and

Gila River Ranch, Inc., an Arizona corporation, Appellants,

v.

Ruben GONZALEZ et al., Appellees.

No. 6919.

Supreme Court of Arizona.

En Banc.

Feb. 27, 1963.

Rehearing Denied May 14, 1963.

Jennings, Strouss, Salmon & Trask, Phoenix, for appellant Gillespie Land and Irrigation Co.

Snell & Wilmer, Phoenix, for appellant Gila River Ranch, Inc.

Harry A. Stewart, Jr., Phoenix, and Leon S. Jacobs, Phoenix, for appellees.

BERNSTEIN, Chief Justice.

On August 19, 1957, a cloudburst occurred in the vicinity of the Sand Tank Mountains south of the city of Gila Bend, Arizona. Water draining from this area flowed down Sand Tank Wash (designated Wash No. 2, on the accompanying diagram) and Washes No. 1 and No. 3 toward the Gila River, which runs north of the city of Gila Bend. Near the city of Gila Bend, Sand Tank Wash and Wash No. 1 intersect the Gila Bend Canal, a waterway system at that time owned by appellant Gillespie Land and Irrigation but since acquired by appellant Gila River Ranch. Since 1920 two structures have existed in the Gila Bend Canal for the purpose of conducting water flowing in Sand Tank Wash and Wash No. 1 across the canal and into the natural channels leading to the Gila River. At the intersection of Sand Tank Wash with the canal there is a "flume and inverse siphon", a combination structure one part of which (the inverse siphon) carries the waters of the canal under the bed of Sand Tank Wash, and another part of which (the flume) acts as artificial bed and banks of the wash to permit waters in the wash to flow over the waters of the canal. At the intersection of Wash No. 1 with the canal there is a "three barrel culvert" designed to carry the waters of this smaller wash under the bed of the canal. A shallow wash runs parallel to the canal between Wash No. 1 and Sand Tank Wash, and carries the overflow from Wash No. 1 to Sand Tank Wash at about the point it enters the flume over the canal. East of Wash No. 1 lies Wash No. 3 which drains into Wash No. 1 near the point where it enters the culvert.

On the date mentioned water flowing in the drainage system described above formed a pool at the intersection of Sand Tank Wash with the Gila Bend Canal, either because the amount of water coming down the wash was more than could be contained within its natural banks and channel, or because the flume and culvert constricted the flow and caused the waters to back up behind the raised levee of the canal. These waters overflowed the banks of the wash and breached a dike constructed along the west side of Sand Tank Wash at the point of its intersection with the canal, flooding the homes of the appellees, who live in an area south of the canal levee and west of Sand Tank Wash. The appellees, hereafter called plaintiffs, commenced

a negligence action for damages resulting from the flood against Gillespie Land and Irrigation, hereafter called Gillespie. They also brought a suit for a mandatory injunction against the present owner of the canal, Gila River Ranch, to require it to alter the conditions they claimed to be responsible for the flooding.

The action against Gillespie was tried to a jury, and the injunction suit against Gila River Ranch to the court. The jury returned a verdict in favor of Gillespie, and the trial court granted a motion for a new trial on the grounds that the verdict was not justified by the evidence. The court also issued an injunction which requires that the Gila River Ranch (1) substantially enlarge the flume at Sand Tank Wash, (2) replace the culvert at Wash No. 1 with a flume, (3) maintain the dike built by Maricopa County along the west side of Sand Tank Wash, and (4) widen the bed of Sand Tank Wash.

Gillespie appeals from the order granting a new trial, while Gila River Ranch appeals from the order granting the mandatory injunction, and from an order denying its petition for relief and to modify the decree.

*The Damage Action Against Gillespie*

The principal argument of the appellant Gillespie is that the trial court erred in granting a new trial, for the reason that a clear preponderance of the evidence substantiates the verdicts in favor of Gillespie. Gillespie also argues that the court improperly admitted the testimony of the plaintiffs' expert as to the volume of water that could be expected at the flume from rains on the watershed drained by Sand Tank Wash. Finally, it contends that 11 of the 22 plaintiffs are gratuitous licensees of Gillespie, and therefore cannot recover for losses resulting from a condition of the land. We will consider the question of admission of evidence first.

Admission of Expert's Estimate.

A qualified expert called by the plaintiffs testified that the amount of water that could be expected at the intersection of the canal and the washes once every ten years was 11,219 second feet. This figure was obtained by use of "the McMath formula", an empirical formula which, the expert testified, is widely used by engineers for estimating the runoff of terrain. The formula incorporates a number of factors and coefficients, some of which are based upon estimates.[1]

---

1. One of these is a coefficient of porosity of the soil based upon an approximation of the relative amounts of hilly land and flat desert land in the watershed. Another is a factor indicating the maximum intensity of rainfall on the watershed for

a period of one hour which would occur at an average of once every ten years. The value 1.36 inches was used in the expert's calculations. This value was derived from interpolations on a chart in a Weather Bureau publication which

At one point the expert witness was asked:

"Q. So your estimate is based on an estimate which is based on an estimate which is based on an estimate, is that correct?

"A. To a certain extent, it is."

It is clear that the opinion of the expert was based in part upon predictions of rainfall intensity originating with persons not present at the trial, which predictions are now compiled in "Technical Paper 24", a publication of the U. S Weather Bureau. These predictions are inferences which are based upon factual data of past weather occurrences. Official records of the Weather Bureau are generally admitted as prima facie evidence of the facts they report, Riddle v. Baltimore & Ohio R. Co., 137 W.Va. 733, 73 S.E.2d 793, 34 A.L.R.2d 1228 (1952); cases cited annot. 34 A.L.R.2d 1249 (1954). "Technical Paper 24" however, does not report the record of weather occurrences, but rather reports inferences which have been drawn from records of weather occurrences.

It has been stated that an expert may not base his opinion upon the inferences and conclusions of others, Mt. Royal Cab Co. v. Dolan, 168 Md. 633, 179 A. 54, 98 A.L.R. 1106 (1935); cases cited, annot. 98 A.L.R. 1109 (1935). The purpose of this rule is to prevent the expert from basing his testimony on assumptions which are unknown to the jury and unsupported by the evidence. McCormick, Evidence, § 15 (1954). Here however, the source of the underlying assumption, the Weather Bureau publication, was admitted in evidence and the manner of its preparation was explained by the Arizona state climatologist of the U. S. Weather Bureau. The same characteristics of disinterest and reliability that permit recognized treatises to serve as the foundation of expert opinion apply here. Cf. Boswell v. State, 114 Ga. 40, 39 S.E. 897 (1901); Thompson v. Ammons, 160 Ga. 886, 129 S.E. 539 (1925); McCormick, Evidence § 296 (1954).

In spite of the compounded uncertainties which admittedly inhere in the calculations of the plaintiffs' witness, these weaknesses

---

indicated the maximum 1-hour rainfall intensity that could be expected every 2 years. The chart was compiled from data obtained from weather stations in the central Arizona area, no one of which, however, is on the watershed in question. The 2-year hourly intensity was converted to a higher 10-year hourly intensity by means of a conversion factor which in turn was based on the records of 27 major weather stations only one of which is in Arizona.

Contrary to Gillespie's contention, the McMath formula does not assume that 1.36 inches of rain fell on the entire watershed. Plaintiffs' witness testified: "Through a great number of experiments taken over a matter of over fifty years this formula has been built up to take care of that matter. Now, your fifth root of your slope divided by your area takes care of the fact that you cannot anticipate a full 1.36 inches over the entire watershed."

go to its weight and sufficiency rather than to its admissibility. We cannot say that an engineering calculation in common use, based in part upon government publications purporting to contain the most reliable data available, is so speculative as to be inadmissible. The witness was extensively cross-examined on the methods by which he reached his estimate of 11,219 second feet, and the possible inaccuracies were fully disclosed to the jury. The members of the jury were properly instructed that they should disregard the opinion if they believed it unsound. Admission of this testimony was not error.

Review of Negligence Evidence.

This court has limited power to reverse the action of a trial judge in granting a new trial for the reason that the verdict is not justified by the evidence, Caldwell v. Tremper, 90 Ariz. 241, 367 P.2d 266 (1962); State v. Bogard, 88 Ariz. 244, 354 P.2d 862 (1960). If, however, it is clear that the trial judge granted the new trial because of a misapprehension or mistake of law, this action will be reversed and set aside. Finn v. American Fire & Casualty Co., 207 F.2d 113 (5th Cir., 1953); General American Life Ins. Co. v. Central Nat'l Bank, 136 F.2d 821 (6th Cir., 1943).

This court has previously considered the legal principles which govern rights and liabilities that arise from the artificial alteration of water courses and the resulting changes in water flow. In Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81 (1944) we adopted this distinction between flood waters and surface waters:

"Flood waters are distinguished from surface waters by the fact that the former have broken away from a stream, while the latter have not yet become part of a watercourse. The term 'flood waters' is used to indicate waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, though the fact that such errant waters make for themselves a temporary channel or follow some natural channel, gully or depression does not affect their character as flood waters or give to the course which they follow the character of a natural watercourse." 61 Ariz. at 418, 150 P.2d at 83.

One legal effect of this distinction was there stated:

" * * * [O]ne has the right to protect himself against 'flood waters,' that is, waters of the character last described, and for that purpose to obstruct their flow onto his land, and this even though such obstruction causes the water to flow onto the land of another." 61 Ariz. at 419, 150 P.2d at 84.

In a series of cases culminating in City of Tucson v. Koerber, 82 Ariz. 347, 313 P.2d 411, we considered the liabilities of

the City of Tucson resulting from the construction of a culvert in a natural arroyo. Both parties in this case cite the Koerber case to support their conflicting positions.

The plaintiffs rely on the following language in that opinion:

"[I]f a municipal corporation constructs a culvert, it will be liable in damages for its inadequacy to carry away waters ordinarily coming into it, both the natural and normal flow and such abnormal and excessive flow as may reasonably be anticipated. * * * the city '* * * was required under the law to build culverts of sufficient size to adequately carry away all water accustomed to flow, or which may reasonably be anticipated to flow down such arroyo as a result of rains upon the watershed which it drained.'" 82 Ariz. at 350, 313 P.2d at 414.

Plaintiffs argue that the defendant Gillespie was required to construct the flume and culvert in this case in such a manner that they would carry all of the water which could be reasonably anticipated to flow from the watershed, and that its failure to do so makes it liable in negligence for the consequential damage to the plaintiffs. Their proof was devoted to showing that as much as 11,000 second feet of water could be expected to flow from the watershed approximately once every ten years, and that an amount of water much smaller

than this could not be passed by the flume and culvert without causing a pool which would overflow plaintiffs' land.

The defendants argue that the language quoted above must be taken as qualified by the following statement in the Koerber case:

"Inherent in the view herein expressed are certain obvious limitations to the city's liability. We have heretofore defined flood waters as being those waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, [citing Proebstel]. Since the city, by covering over the arroyo and providing culverts has only attempted to control the flow of waters within the arroyo, it has assumed no responsibility for water which naturally leaves the channel and, therefore, is not liable for the damages caused by flood waters. The city's immunity from liability for damages caused by flood waters is absolute unless some other act or acts of the city caused or contributed to the overflow." 82 Ariz. at 357, 313 P.2d at 414

We agree that a landowner is not responsible for his diversion of or his failure to carry away flood waters, unless some other act contributes to their destructive effect.

The language of the Koerber case was relied upon by the plaintiffs and by the

trial court to the effect that one who alters a natural watercourse will be liable " * * * for its inadequacy to carry away waters ordinarily coming into it, both the natural and normal flow and such abnormal and excessive flow as may reasonably be anticipated," and must " * * * carry away all water accustomed to flow, or which may reasonably be anticipated to flow down such arroyo as a result of rains upon the watershed which it drained." 82 Ariz. at 350, 313 P.2d at 414. This language must be understood to refer only to the waters which can be contained within the natural bed and banks of the watercourse.[2] In the Koerber case, the evidence tended to show that the arroyo had a capacity of 3920 second feet, that the amount of water flowing in the arroyo was 3140 second feet, but that the capacity of the culvert was only 2700 second feet. The court did not characterize any of the waters in that case as flood waters, and the opinion makes clear that the city was not liable for damage caused by flood waters as defined in the Proebstel case, supra.

The findings and conclusions of the trial court made in the present injunction suit (which will be discussed hereafter) make it clear that the court misconceived the legal liability of the defendant by imposing upon it a duty to carry away all of the waters which might be generated by the watershed which drains into the washes in question.

We must now examine the evidence in this case to determine if the plaintiffs' damages were caused by flood waters, by defendant Gillespie's diversion of stream waters or by some other negligent act of the defendant. The evidence is undisputed that there was no rainfall in Gila Bend on the day in question, and only .03 inch at the Gila Bend airport which is south of the canal and the area in which the plaintiffs reside. There is, therefore, no question of liability for diversion of surface waters in this case.

The evidence in the extended trial of this case disclosed the following: At the time of the construction of the flume and culvert in 1920, Sand Tank Wash was a well defined channel with bed approximately 60 feet wide and banks eight feet high. Under conditions then existing, the flume did not constrict the flow of water in the wash.[3] Gillespie's resident engineer rode

2. No evidence was adduced at the trial to show the existence, boundaries, or capacity of any higher flow watercourse than the channels previously described, nor was the case tried on the theory that such a high flow channel exists.

3. Pictures taken by Gillespie's resident engineer shortly after the flume was completed in 1920 were admitted. These showed water flowing in the wash and flume at flood stage. The engineer testified that the wash was flowing at 90 percent of capacity, and that the flume could have handled three times as much water.

over the watershed draining into Sand Tank Wash prior to the construction of the flume, and by the use of an engineering formula (the "Burgli-Ziegler" Formula) calculated that the maximum amount of water that could be expected to flow from the watershed through the flume was 4000 second feet. Since 1920 the height of the banks of Sand Tank Wash has decreased. In 1950 a flood occurred which, for the first time since the flume was built, inundated the lands occupied by the plaintiffs. The evidence tended to show that this flood was caused by debris blocking the flow of water under a railroad bridge down stream from the flume which backed up the water through the flume. In 1955 two floods occurred which overflowed plaintiffs' lands, but no evidence as to the cause of these floods was received. Thereafter, at the request of the plaintiffs, Maricopa County constructed a dike along the west bank of Sand Tank Wash on an easement granted by Gillespie. Material for this dike was taken from the banks of the wash, thereby lowering these banks at the intersection of the wash and canal to approximately two feet.

Evidence presented concerning the events of August 19, 1957, was conflicting in some particulars, but tended to show the following: There was no rain in the immediate vicinity of Gila Bend that day. The waters began to rise in Sand Tank Wash in the early afternoon of that day and reached a crest between 4:30 and 5:30 p. m. at which time they overflowed the county dike on the west bank of Sand Tank Wash and continued into the area occupied by the plaintiffs. One of the plaintiffs testified that at the time he observed the water in the wash coming over the dike there was no water flowing from the wash itself into the area in which he lived. However, three disinterested witnesses, including one who flew over the area several times at low altitude, testified that the wash was overflowing its banks all along its course, and more particularly in the area south of the county dike. They testified that water was flowing into the area where the plaintiffs lived some time before it began to wash over the top of the county dike near the flume. One of these witnesses testified that, earlier in the afternoon, when the water was running bank to bank in Sand Tank Wash the flume was slightly over half full, and was draining the water without any ponding or backing up effect. This witness also noticed a stream of water flowing into Sand Tank Wash from the direction of Wash. No 1 about the time the dike overflowed.

Evidence based on an engineering survey made after the August 19, 1957, flood provided the following facts: The bank to bank capacity of Sand Tank Wash at the point nearest to the flume where its natural banks remain unaltered, together with the capacity of two small tributaries that entered the wash between this point and the

flume is 2,503 second feet. The combined bank to bank capacities of Wash No. 1 and Wash No. 3 is 1001 second feet. A flow of 3500 second feet (the combined bank to bank capacities of the three washes) would cause the water to rise to a level of 5.5 feet in the flume.[4] This volume of water would not overflow the nearest natural banks upstream from the flume. A stream of 6800 second feet of water would reach the top of the reconstructed county dike but would rise only 8.5 feet in the flume.[5] An engineer who participated in this survey testified that the capacity of the natural 60 by 8 foot channel of the wash in 1920 was less than 6800 second feet.

This same survey showed that the capacity of the culvert at Wash No. 1 was 739 second feet, some 270 second feet less than the combined capacity of that wash and Wash No. 3. Other evidence showed that the culvert was often half filled with sand, but whether this would impede the flow of water was disputed. It was also shown that the culvert was clogged with brush and debris on the day following the flood. The defendants' theory of the case is that even if the culvert was completely clogged and the water thus diverted to Sand Tank Wash, the flume could handle the flow of water without causing it to overflow the natural banks of the wash. However, defendant's witness, who participated in this engineering survey, testified that diversion of 1000 second feet of water from Wash No. 1 to Sand Tank Wash would cause a pooling and slowing of the water behind the flume.

We think the evidence in this case clearly shows that the flume at Sand Tank Wash is capable of carrying all of the combined waters which can now flow in the natural watercourse, not only in Sand Tank Wash, but in all of the washes under consideration. Unless some other basis of liability appears, the defendant is not liable for any failure of the flume to carry away more water than the natural capacity of the watercourse which flows into it. Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81 (1944). Nor can we agree with the plaintiffs that the evidence would support a finding that the defendant assumed the duty to carry away all of the water generated by the watershed by its action of sending an engineer out to examine the extent and nature of the watershed. The undisputed evidence was that this engineer calculated the maximum flow from the wa-

---

4. The flume has a base of 51 feet with 12 foot high sides that slope outward at 45 degree angles. Thus, 5 feet above the flume bed the width of the flume is 10 feet more than at the base.

5. The witness testified that the "head" or height differential between the water behind the flume and the water in the flume was caused by an increase in the velocity of the water as it enters the flume, with a consequent lowering of the level of the water in the flume.

tershed through the flume at 4000 second feet, and that the flume design was approved because it could carry this flow with a reasonable margin of safety.

A different problem is presented, however, by the evidence that the culvert at Wash No. 1 is inadequate in size to carry the combined flow of the waters draining into it, and that this culvert is susceptible of becoming clogged with sand and debris. The jury could have found that the full flow of Washes Nos. 1 and 3, including 1000 second feet of natural stream flow, was diverted by the clogged culvert and the canal levee into Sand Tank Wash where the force of its current caused a pooling effect which slowed and impounded the waters flowing down Sand Tank Wash. It could also have found that this artificial diversion contributed to the cause of the flood and to the plaintiffs' resulting loss.

A landowner may not divert the natural waters of a stream in such a manner that these waters, combined with flood waters, cause damage to his neighbor, Smith v. City of Los Angeles, 66 Cal. App.2d 562, 153 P.2d 69 (1944); Clement v. State Reclamation Board, 35 Cal.2d 628, 220 P.2d 897 (1950). In the Smith case, the complaint alleged that the defendants had diverted the natural flow of water from two of three channels of the Tujunga River into the third channel, with the result that this channel was overtaxed and flooded the plaintiffs' land when storm waters collected and flowed into the river. This complaint was held to state a cause of action.

From the evidence as it appears in the record, we might not have overruled the jury and granted a new trial, however, we did not sit in the position of the trial judge. We cannot now say that this evidence so clearly shows that the verdict was correct that the trial judge abused his broad discretion to grant a new trial. Cf. Caldwell v. Tremper, supra.

The Status of the Plaintiffs.

Gillespie contends, however, that the record establishes that 11 of the 22 plaintiffs are gratuitous licensees of Gillespie, and therefore that Gillespie could be liable to these 11 only for damages caused by its active negligence, or for hidden perils existing on the premises, and not for any loss that results from an observable condition of the land. This is indeed the rule in this jurisdiction, Mull v. Roosevelt Irrigation Dist., 77 Ariz. 344, 272 P.2d 342 (1954). The condition of the culvert at Wash No. 1 was not a hidden peril under the rule of that case. No act or omission of the defendant concealed it with an innocent appearance. Moreover, the occurrence of three floods within the seven years prior to the date of this flood (although the condition of the culvert was not shown to be a contributing factor to those floods)

should have dispelled any misconceptions that the culvert was an adequate insurance against the ravages of nature. To those whom the evidence establishes to be gratuitous licensees of Gillespie, Gillespie is not liable. Mull v. Roosevelt Irrigation Dist., supra.

Because of the posture of this case, we cannot take the evidence of Gillespie's ownership of the land to be so conclusive that we must now rule, as a matter of law, that these plaintiffs were licensees of Gillespie. The trial judge's exercise of his discretion to grant a new trial for the reason the verdict was not supported by the evidence makes inconclusive this part of the defendant's proof as it does all other parts.

It is argued on behalf of these 11. plaintiffs that, though they may have entered the premises as licensees of Gillespie, their action in improving the land and building thereon makes them more than mere licensees. We are referred to Keystone Copper Mining Co. v. Miller, 63 Ariz. 544, 164 P.2d 603 (1945) where we held that "[a]n executed license, as where the licensee expends money in constructing buildings and uses the ground with the assent, knowledge and acquiescence of the owner, creates or results in an equitable right capable of being assigned and which may not be disregarded or revoked by the owner of the premises." This principle may be applicable here, but its only effect is to prevent revocation of the license, not to extend the measure of the rights of the licensee nor to create an added duty on the part of the landowner. The plaintiffs also cite Rendall v. Pioneer Hotel, 71 Ariz. 10, 222 P.2d 986 (1950). There we stated that "if exclusive possession or control of the premises or a portion thereof is granted * * * the instrument or agreement will be considered to be a lease and not a license." In that case there was an agreement which gave the tenant exclusive control of the premises during the period of its use. Here there was no agreement of any kind, but simply the acquiescence of Gillespie in the use of his land by the plaintiffs. The fact that Gillespie never interfered with this use does not change their status from that of licensees.

### The Injunction Suit Against Gila River Ranch

We turn now to the injunction suit against the second defendant, Gila River Ranch, which acquired the interest of Gillespie in the canal and adjoining property on August 23, 1957.

The court granted a mandatory injunction against Gila River Ranch which required it to do the following: (1) increase the width of the flume at Sand Tank Wash from 51 feet to 107 feet; (2) replace the culvert at Wash No. 1 with an inverted siphon and flume similar to that at Sand Tank Wash

having a base width of 36 feet; (3) maintain the dike constructed by the county along the west bank of Sand Tank Wash in the same condition as at the time of its installation, and (4) widen the bed of Sand Tank Wash to a width of 107 feet for a distance of one-quarter of a mile south of the flume. The court also enjoined the transfer of the canal system until these changes were made.

An appellate court will not substitute its judgment for that of the trial court where there is substantial evidence to support the injunctive decree, American Auto Ass'n v. American Auto Owners Ass'n, 216 Cal. 125, 13 P.2d 707, 82 A.L.R. 699 (1936). Nevertheless, the trial court abuses its discretionary power to grant an injunction when it misapplies the law to undisputed facts, DeSoto v. DeJaquez, 44 N. M. 564, 106 P.2d 301 (1940); Westinghouse Electric Corp. v. United E. R. & M. Workers, 353 Pa. 446, 46 A.2d 16, 163 A.L.R. 656 (1946), and an improper decree will be set aside upon review by the appellate court.

It is apparent from the record that the court's order incorporated, and was based upon, the recommendations of the plaintiffs' expert witness who testified that structures of this nature would be necessary to handle the 11,219 second feet of water which he predicted would be generated by the watershed approximately once every ten years.

The judgment stated as a finding that by reason of the installation of the flume and culvert Gillespie "assumed the duty of providing adequate installations to carry away to the Gila River waters ordinarily coming into the Washes * * *," which duty was assumed by Gila River Ranch.

We have previously indicated that the evidence in this case does not support a finding that Gillespie voluntarily assumed the duty to carry away any more water than the maximum volume which its engineers calculated would be generated on the watershed and would flow to the flume within the bed and banks of Sand Tank Wash. We have also stated that the law of this state does not require a landowner to carry away flood waters, such being those waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, but permits him to divert such waters from his land as a common enemy. Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81 (1944); City of Tucson v. Koerber, 82 Ariz. 347, 313 P.2d 411 (1957).

Order to Widen the Flume at Sand Tank Wash.

The evidence is undisputed that the volume of water which the trial court's decree requires the defendants to carry away cannot be contained within the bed and banks of the principal and tributary

washes which drain through the flume and culvert, and therefore that this volume includes flood waters. Plaintiffs' expert himself testified that water of that volume would "spread over a wide, broad valley about 2000 feet wide." It is also undisputed that the flume can now carry more than the present capacity of Sand Tank Wash and its tributaries without any ponding effect behind the flume. Moreover, the uncontroverted evidence was that the flume, following its construction in 1920, was capable of carrying away all the waters that would flow within Sand Tank Wash as it then existed, without any damming or backing effect. No evidence was adduced to show that Gillespie or Gila River Ranch did anything to alter the nature of the bed and banks of Sand Tank Wash. On the contrary, it was shown that employees of Maricopa County broke down the banks of the wash near the flume in the process of constructing a dike along the west bank of the wash to protect the plaintiffs, and at their request.

Under this state of facts, neither Gila River Ranch nor its predecessor in interest is charged with a legal duty to carry away more than the natural bank to bank flow of waters in the Sand Tank Wash. That portion of the court's injunctive decree which required Gila River Ranch to widen the flume at Sand Tank Wash is not supported by any evidence and is therefore set aside.

Order to Replace the Culvert at Wash. No. 1.

That portion of the trial court's decree which requires Gila River Ranch to replace the culvert at Wash No. 1 with a flume similar to that at Sand Tank Wash finds support in the evidence which shows that the culvert is not large enough to carry away the combined bank to bank volume of Wash No. 1 and Wash No. 3 which drain into it. It was also shown that the culvert was susceptible of becoming clogged with brush and debris, in which event the waters in these washes would be diverted to Sand Tank Wash there causing a slowing and pooling of flood waters flowing into the flume. Gila River Ranch attempted to show at a subsequent hearing that it has made changes in the canal and dike at Sand Tank Wash which will permit excess waters to flow into the canal and will carry away 12,000 second feet of water without flooding the area in which plaintiffs live. This evidence was controverted and the court denied Gila River Ranch's petition for relief and to modify the decree.

█ The discretion to be exercised in injunctive proceedings of this nature is that of the trial court, not of the appellate court. Rick v. Cramp, 357 Pa. 83, 53 A.2d 84 (1947). We have herein held that a landowner may not divert stream water in such a manner as to compound the destructive effect of flood waters. We cannot say that

even with the alterations made by the Gila River Ranch the diversion of stream waters from Wash No. 1 and Wash No. 3 will not have that adverse effect.

■ For the sole reason that the size of the structure which the defendant was directed to build at Wash No. 1 appears to be based on its ability to carry away flood waters (which the defendant is not required to carry away) as well as stream water, we will set aside this portion of the decree with instructions to the trial court to reconsider defendant's obligations in view of the legal principles herein set forth.

Order to Maintain the County Dike.

■ The third feature of the injunctive decree is the requirement that Gila River Ranch maintain the county dike along the west bank of Sand Tank Wash. The dike is the property of Maricopa County, and was built at the request of plaintiffs upon an easement granted by Gila River Ranch's predecessor, Gillespie. There is no evidence upon which a duty of the defendant to maintain the dike can be predicated, except the evidence of the effect of the defendant's possible diversion of stream waters at Wash No. 1. To the extent that the decree requires the defendant to maintain the dike beyond a time when it shall have made provision to carry away all of the stream waters which it is required to carry away, it is erroneous and without legal foundation. A landowner who is the grantor of an easement is not required to maintain it, City of Bellevue v. Daly, 14 Idaho 545, 94 P. 1036, 15 L.R.A., N.S., 992 (1908). The trial court is instructed to modify the decree in this respect.

Order to Widen the Stream Bed.

■ It was likewise erroneous for the trial court to require the defendant to widen the stream bed of Sand Tank Wash to 107, feet. The evidence is undisputed that neither of the defendants had anything to do with the alteration of the bed and banks of the Sand Tank Wash, but is rather that the principal cause of alteration was the construction of the dike, at the request of the plaintiffs, at which time material was taken from the banks of the wash. Moreover, the direction to widen the stream bed was an adjunct to the direction to widen the flume, an order which we have found to be erroneous.

Order Enjoining Transfer of the Canal.

■ Finally, the court enjoined the transfer of the canal system until such time that the required alterations would be completed. By its terms and under the law, the injunction is binding upon successors in interest to the property in privity with the defendant, Lackaff v. Bogue, 158 Neb. 174, 62 N.W.2d 889, (1954); 43 C.J.S. Injunctions § 263d. Therefore, this portion of the court's order afforded no additional pro-

tection to the plaintiffs, and is contrary to the usual rule that the plaintiff must have some lien or interest in the property of the defendant before its transfer can be enjoined, Irwin v. Meese, 325 Mich. 349, 38 N.W.2d 869 (1949); Turner v. Harris, 198 Tenn. 654, 281 S.W.2d 661 (1955). The injunction against transfer was erroneous and is set aside.

These cases are remanded to the trial court for action consistent with this opinion.

UDALL, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.

NOTE: Justice JENNINGS, having disqualified himself, the Honorable JOHN A. McGUIRE, Judge of the Superior Court of Yuma County, Arizona, was called to sit in his stead and participate in the determination of this appeal.

JOHN A. McGUIRE, Superior Court Judge (specially concurring).

I concur in the disposition of the case by the Court except in one particular; I believe that the case should be remanded for the taking of further testimony as to what, if any, changes in the flume and inverted siphon at Sand Tank Wash should be made in order to render it capable of carrying the amount of water it should lawfully be required to carry, as the Court did in reference to the structure at Wash No. 1, instead of completely vacating the injunction as to the Sand Tank Wash flume. I agree that Gila River Ranch cannot be required to widen the wash, nor maintain the dike built by Maricopa County, nor be restrained from conveying the property.

The case of Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 424, 150 P.2d 81, 86, involving a dike built by the railroad to protect its land and to cause flood waters of Coyote Wash to be turned back to the wash dealt with an entirely different situation. In that case, the court stated:

"Under the unquestioned facts as disclosed by this record defendant was clearly entitled to a directed verdict at the close of the case for the reasons that it was apparent from all the competent testimony of the witnesses that defendant's dike intercepted and *returned to* Coyote Wash flood waters, merely *increasing* the flow of a well-defined and *natural watercourse* without exceeding the stream-carrying capacity which, in the exercise of its lawful right to protect its own property, it could do; the learned trial judge apparently erroneously concluded that the case was governed by Maricopa etc., v. Roosevelt Irr. Dist., supra." (Emphasis added)

The Tucson Arroyo cases culminating in City of Tucson v. Koerber, 82 Ariz. 347, 313 P.2d 411, must also be distinguished. These cases involved the placing of a structure in

an arroyo but not the building of anything obstructing waters *outside* of the arroyo; hence there could be no liability for flood waters which could never be carried within the arroyo in the first place and hence were not obstructed by the culvert.

In the case at bar the defendant, Gila River Ranch, for its own benefit maintains a raised irrigation ditch running for miles and which passes between the Sand Tank Mountains and the Gila River at approximately right angles to the normal flow of water draining from the mountains to the river.

In the California case of Costello v. Bowen, 80 Cal.App.2d 621, 182 P.2d 615, 620, the court said:

"But the drastic rule which allows a property owner to divert such waters to the lands of others *only applies to flood waters in the strict sense, that is, waters escaping because of their height from the confinement of a stream and running over adjacent property.* Implicit in the definition of flood waters is the element of abnormality; they are flood waters *because of their escape from the usual channels under conditions which do not ordinarily occur."* (Italics added.)

The plaintiffs' land has been flooded four times in seven years, which is not so rare and extraordinary that it need not be guarded against; hence if defendant's structures are responsible the defendant must modify them as necessary.

As was mentioned in the majority opinion, the case was not tried on the theory that a high flow channel existed, that is, a channel above the normal banks of the wash, in which water flows at times of high water. Such waters would be considered stream waters and not flood waters. Miller & Lux v. Madera Canal & Irr. Co., 155 Cal. 59, 99 P. 502, 22 L.R.A., N.S., 391; Herminghaus v. Southern California Edison Co., 200 Cal. 81, 252 P. 607.

I do not consider this fatal to plaintiffs' case. I am not convinced that the structures built by defendant would not be the cause of flooding even after the flume at Wash No. 1 is built. Hence I would remand for retrial of this very question.

In my opinion the proper standard to be applied to both flumes is that they must be of sufficient size to carry all water, both the natural and normal flow, and such excessive flow as may reasonably be anticipated at the point involved, and this whether such anticipated waters be called stream or flood waters. Defendant is not of course required to make provision for abnormal flood waters not reasonably foreseeable, neither is it required to take steps to prevent flooding which would occur even if its ditch were not there.